IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND PATRIOTS FANS | ) CIVIL ACTION<br>) Docket No: -CV-<br>) CIVIL ACTION |
| Plaintiffs | ) Docket No.: -CV- |
| vs, | )<br>) |
| NATIONAL FOOTBALL LEAGUE, | ) **EXPEDITED COMPLAINT**<br>) **FOR TEMPORARY** |
| and | ) **RESTRAINING ORDER AND**<br>) **PRELIMINARY INJUNCTION** |
| ROGER GOODELL, COMMISSIONER,<br>Individually and in his capacity as the<br>Commissioner of the NFL | )<br>)<br>) |
| and | )<br>) |
| ROBERT KRAFT,<br>Individually and in his capacity as the owner<br>of the New England Patriots | )<br>)<br>)<br>) |
| Defendants | ) |

## EXPEDITED COMPLAINT

Plaintiffs, New England Patriots Fans, pursuant to Massachusetts Rule of Civil Procedure 65, by their counsel, individually and on behalf of all other similarly situated as and for their Complaint against Defendants and respectfully move this Court for an Expedited Temporary Restraining Order and Preliminary Injunction against Defendants.

Specifically, Plaintiffs ask this Court to enjoin Defendants from enforcing the unlawful taking of the New England Patriots first-round draft choice in the April 28, 2016 National Football League ("NFL") Draft for no valid or lawful reason. In support of this Motion, the Plaintiffs rely upon their Brief in Support of Expedited Motion for Temporary Restraining Order and Preliminary Injunction and the evidence filed pursuant to Massachusetts law, and assert upon information and belief as follows:

## PRELIMINARY STATEMENT OF THE CASE

1. This case is brought by New England Patriots fans on behalf of all Patriots fans who believe the New England Patriots professional football team, ("Patriots")

were harmed by the Defendants' arbitrary and capricious decision to revoke the Patriots first round draft choice in the April 28, 2016 NFL Draft for alleged participation in a cheating scandal popularly referred to by the media as "Deflategate."

2. The Patriots and specifically their quarterback Tom Brady have vehemently denied their involvement in any cheating scandal involving the deflation of balls during the January 2015 AFC Championship game or at any other time.

## JURISDICTION AND VENUE

3. This court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §1331, 28 U.S.C. §2201, 12 U.S.C. §3416, 12 U.S.C. §3417, 12 U.S.C. §3418, and over the state claims pursuant to 28 U.S.C. §1332 and 28 U.S.C. §1367. This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

4. Plaintiffs are informed, believe and thereon allege that Defendants have sufficient contacts with their district generally and, in particular, with the events herein alleged, that Defendants are subject to the exercise of jurisdiction of this court over the person of such Defendants and that venue is proper in this judicial district pursuant to 28 U.S.C. §1391. The proper venue for this matter is the Boston vicinity because the acts complained of occurred in the Boston area, specifically Foxborough, MA.

5. Plaintiffs are informed, believe and thereon allege that, based on the places of business of Defendants identified above and/or on the national reach of Defendants, a substantial part of the vents giving rise to the claims herein alleged occurred in this district and that Defendants and/or agents of Defendants conduct business in this district by nature of the New England Patriots of Massachusetts are one of 32 NFL teams located in this district, that which the Defendants conduct business with. Plaintiffs and Defendants regularly engaged in business and transactions within this jurisdiction.

6. Venue is properly laid in the United States District Court for the District of Massachusetts, as this district includes Foxbrough, MA home to the National Football League's (NFL) New England Patriots, one of 32 NFL ("League") teams. The National Football League is a trade association made up of and financed by its 32 member teams. The Plaintiffs have subject matter jurisdiction over the subject draft pick as it has been taken from the Plaintiffs' team- the Patriots within the jurisdiction of this court. Plaintiffs have personal jurisdiction over the Defendants, as Defendants are associated with the Patriots as members, owner and Commissioner with certain powers over the team.

## PARTIES

7. Plaintiff Todd Orsatti is an adult and a resident of the town of Bristol, Connecticut, county of Hartford, is a Patriots season-ticket-holder since 2011 and lifelong Patriots fan. Orsatti attends games with his 7 year old daughter. She will no longer go to games with him because she thinks it the games are fixed by the NFL after her team was punished based merely on conjecture. She is talking about finding another team which has left Orsatti "devastated."

8. Plaintiff David Vacarro is an adult and a resident of the town of Plainville, Massachusetts, county of Norfolk.

9. Michael DiMauro is and adult and a resident of the city of Orlando, Florida, county of Orange. He pays a considerable amount of money to watch the Patriots from Florida on NFL Sunday Ticket. His affidavit and exhibits are attached.

10. Fairuz Zein is an adults and a resident of Cambridge, Massachusetts, county of Middlesex.

11. Ken Wlodarczyk is an adult and resident of Sewell, New Jersey, county of Gloucester.

12. Joseph Payne is an adult and resident of Ft. Lauderdale, Florida, county of Broward.

13. Feihua Chang is an adult and resident of Newton, Massachusetts and county of Middlesex.

14. Defendant National Football League, ("NFL") is a professional football league, made up of 32 teams, including the Patriots. Its headquarters is located at 345 Park Avenue in New York City, New York, county of New York.

15. Defendant Roger Goodell is an individual who in employed by the NFL at 345 Park Avenue, New York City, he resides in the city of Bronxville, New York, county of Bronx.

16. Robert Kraft is the owner, chairman of the board and CEO of the Patriots. who has its headquarters at One Patriot Place, Foxborough, Massachusetts 02035, county of Norfolk. He resides in the town of Chestnut Hill, Massachusetts, county of Middlesex.

## FACTUAL ALLEGATIONS

17. Sports Illustrated's Legal Analyst Attorney and Professor Michael McCann laid out the details of the Deflategate saga as follows:

18. The controversy that became known as Deflategate started when Colts linebacker D'Qwell Jackson intercepted a pass thrown by Brady in the second quarter of the

3

AFC championship game. Colts personnel believed the football seemed a little light, and when an intern measured its air pressure, he found the intercepted football to be less than 12.5 pounds per square inch or PSI, the basic unit for measuring pressure. This was significant since NFL rules require that game footballs fall within a range of 12.5 to 13.5 PSI. Those rules also assign a minimum penalty of a $25,000 fine to those who tamper with game footballs' air pressure and other qualities. The NFL regulates the PSI of footballs to ensure uniformity in how games are played and, although many football players downplay its competitive significance, slightly under-inflated footballs may be easier to catch.

19. Colts officials then alerted the referees about the intercepted football's air pressure and the referees in turn alerted NFL officials. Referees and league officials then tested the same intercepted football three times, yielding results of 11.45 PSI, 11.35 PSI, and 11.75 PSI. The league then ordered that the Patriots' other 11 footballs be tested at halftime; four Colts footballs were also tested at that time. While two different types of gauges were used and produced inconsistent results, all 11 of the Patriots footballs and three of the four Colts footballs measured under 12.5 PSI. The footballs were then re-inflated and used in the second half. Brady actually performed better using the re-inflated footballs, completing 12 of 14 passes.

20. The ball deflating was not terribly surprising, given that the game was played in weather conditions—cool and rainy—that tend to cause footballs to lose pressure. Even in good weather, footballs lose pressure as they are used. Indeed, as Massachusetts Institute of Technology Professor John Leonard has demonstrated, the PSI measurements taken at halftime are consistent with Ideal Gas Law, a basic scientific formula used to measure pressure when temperature, volume and number of gas moles are known. His findings are consistent with the findings of others, including data scientist Nick Kistner, three authors at AEI and University of New Hampshire science professors Michael Briggs and Martin Wosnik.

21. In the hours and days following the game, Brady repeatedly brushed off questions about deflated footballs, at one point insisting, "I would never do anything to break the rules."

22. The dynamics of Deflategate changed two days after the AFC championship game, when ESPN's Chris Mortensen tweeted that 11 of the Patriots footballs were under-inflated by two PSI. A league source had leaked Mortensen this startling news on the condition of anonymity.

23. The considerable degree to which the footballs were reportedly under-inflated suggested that human misconduct played an explanatory role. The obvious inference was that the Patriots had hatched a deflation plot. This report would later prove wrong—nine of the 11 footballs actually measured 11.35 PSI or higher—but by then Deflategate had been transformed from an odd sports

controversy into a national news crisis. Had the most dominant NFL franchise over the last 15 years been cheating? Were the Patriots, who had already disregarded an NFL memorandum in the "Spygate" controversy, breaking rules the whole time?

24. For Patriots haters, Deflategate seemed like a gift. For many scientists, Deflategate seemed like a lot of hot air. And, for the Patriots and coach Bill Belichick, their focus remained on playing the Seattle Seahawks in Super Bowl XLIX, which the Patriots would go on to win aided by a memorable Malcolm Butler interception.

25. In response to the growing controversy, Goodell launched what he styled as an "independent" investigation to be co-run by attorney Ted Wells of the prominent New York law firm Paul, Weiss, Rifkind, Wharton & Garrison and by NFL general counsel Jeffrey Pash. Their investigation would last more than three months. During this time, Patriots employees met repeatedly with Wells and submitted materials studied by Exponent, an engineering and scientific consulting firm retained by Wells and his team. The choice of Exponent, which has secured government contracts from NASA and FEMA, drew criticism from some corners. Critics have labeled Exponent a "hired gun" used by companies to reach scientific conclusions that are compatible with those companies' legal and financial interests. Here, the inference was that the NFL—which employs referees who were criticized in Deflategate and the officials who leaked information to media—wanted results showing that the Patriots were at fault.

26. On May 6, 2015, the much-anticipated report authored by Wells and others was released. Over the course of 234 pages, Wells lobbed serious accusations at the Patriots and particularly Brady. Wells concluded it was "more probable than not" that Brady was "at least generally aware" Patriots locker room attendant Jim McNally and equipment assistant John Jastremski plotted and carried out "a deliberate plan" to use slightly under-inflated footballs. While the league's Policy on Integrity of the Game & Enforcement of Competitive Rules required that Wells use the "more probable than not standard," the applicability of that standard to Brady, who is protected by the CBA, remains a source of legal debate and Wells' decision to use—and the technical meaning of—the "at least generally aware" standard remains a mystery.

27. There was no direct evidence for any of the key accusations in the Wells Report. Not one witness mentioned a deflation plot and not one video or recording revealed such a plot. Instead, the Wells Report reached conclusions by extrapolating circumstantial evidence. Such evidence included increased phone and text communications between Brady and Jastremski following the AFC championship game, a pattern that might sound suspicious unless you consider that the Patriots were also preparing to play in the Super Bowl. Wells also repeatedly highlighted one single text sent by McNally to Jastremski in May 2014—during the offseason when McNally was not working for the Patriots and

eight months before an AFC championship game whose participants were
unknowable in May 2014. In that text, which was one of hundreds shared by the
Patriots, McNally referred to himself in a seemingly joking way as "the deflator,"
which the Patriots' "Wells Report in Context" contends likely concerned
McNally's efforts to lose weight.

28. Wells also found it notable that McNally took the footballs into the bathroom
before the game for one minute and 40 seconds (which, perhaps revealingly, is
also consistent with the amount of time it takes to use the bathroom) and that
Brady complained about the footballs being too inflated following a Patriots-New
York Jets game in October 2014 (but no evidence surfaced that Brady directed or
encouraged the footballs be deflated below 12.5 PSI). Wells also disapproved of
Brady's unwillingness to share all electronic and phone information, but no rule
compelled Brady—who was disturbed by league leaks—to share such information
and Wells would later testify that he would not have punished Brady over his
refusal. Wells also had access to texts sent by Brady to Jastremski and McNally
when the latter two turned them over.

29. In short, after a three-month, multi-million dollar investigation, actual proof of a
plot to deflate footballs was never found. In the absence of such evidence, it is
difficult to understand why Wells found such a plot "more probable than not."

30. Five days following publication of the Wells Report, Goodell doled out harsh
punishments on grounds that the Patriots as an organization and Brady as a player
had breached the integrity of the game and failed to fully cooperate in a league
investigation. The Patriots were fined $1 million, and they lost their first-round
pick in the 2016 NFL draft and fourth-round pick in the '17 draft. But the biggest
punishment was Brady's four-game suspension.

31. The Patriots and Brady were in very different legal positions to appeal Goodell's
punishments. As a franchise, the Patriots had contractually relinquished rights to
contest league discipline that the team might otherwise enjoy. Like the 31 other
NFL franchises, the Patriots are required to adhere to the league constitution,
which expressly precludes teams from going to court to challenge decisions by the
league and its commissioner. The Patriots could have internally petitioned
Goodell to reconsider his punishment, but doing so would have enlarged the
controversy and, perhaps more importantly, appeared doomed to fail: by all
accounts, Goodell is unbendingly wedded to the belief that the Patriots deflated
footballs.

32. Some nonetheless urged Patriots owner Robert Kraft to pursue the antitrust
litigation strategy used with some success by the late Oakland Raiders owner Al
Davis in the 1980s and '90s. Indeed, Kraft could have argued that the NFL and
certain teams, such as the Colts and other AFC rivals, had conspired to frame the
Patriots of wrongdoing and that such a conspiracy constituted anti-competitive
conduct. There were emails between Colts general manager Ryan Grigson and

NFL officials David Gardi and Mike Kensil (who formerly worked for the Patriots arch rival, the Jets) prior to the AFC championship game about Grigson's belief that the Patriots were intentionally under-inflating footballs. Some believe the Patriots were set up in a sting operation of sorts.

33. Still, such a litigation strategy would have likely taken years to play out and would have awkwardly pitted the 74-year-old Kraft in court against the same league in which he is considered one of its most influential figures. Kraft's argument would have also been a difficult fit for antitrust law. Recall that Davis had used antitrust law to challenge the NFL on the issue of business relocation, which is a type of controversy well suited for antitrust law. Kraft's antitrust challenge, in comparison, would have been based on league discipline, which is a traditional power of a professional sports league and is less likely to have received a favorable reception in court. Therefore, it's not surprising that Kraft declined to challenge the NFL, even if the loss of draft picks is a source of great aggravation to the Patriots and their fans.

34. In striking contrast, Brady, as a member of the NFLPA, enjoyed the collectively bargained right to appeal Goodell's punishment. That right is found in Article 46 of the collective bargaining agreement (CBA) and calls for Goodell or his designate to hear an appeal. Brady exercised that right, and despite demands by the NFLPA that Goodell recuse himself as the hearing's presiding officer, Goodell elected to serve as that officer. In other words, Goodell would decide whether he was correct in suspending Brady for four games.

35. Brady's appeal was heard at the league's headquarters on June 23, 2015. Attorneys Jeffrey Kessler and David Greenspan represented Brady during the hearing, which lasted all day. Brady elected to testify under oath during the hearing, which means Brady risked the potential of criminal perjury charges if it was later determined that he knowingly lied. This is an important point. Many athletes adamantly deny wrongdoing through press conferences, media interviews or spokespersons. When doing so, they can lie without the risk of criminal charges since they are not under oath. Brady, in contrast, would have risked criminal charges by lying during his appeal. Brady categorically denied any involvement or knowledge of a ball deflation plot. His attorneys also stressed that the collective bargaining agreement did not authorize a suspension for an equipment controversy and that similar controversies (such as use of Stickum or heated footballs, or Brett Favre's $50,000 fine for uncooperative conduct in a league investigation) never triggered suspensions.

36. Brady's legal team objected to several aspects of the hearing. For one, Paul Weiss attorney Lorin Reisner, who had assisted Wells in investigating Brady and the Patriots in their "independent" investigation, sat with league counsel and asked Brady many questions. This exchange undermined the veneer of separation between Wells and the NFL. Further, Brady's legal team was denied an opportunity to review investigative notes and to cross-examine Pash, who

Goodell, while acting as the commissioner, had tapped to co-lead the investigation. Goodell, while acting as the arbitrator, reasoned that Pash's testimony would have been "cumulative" of testimony by Wells since Pash's involvement in Wells investigation was allegedly minimal.

37. On July 28, 2015, Goodell issued his ruling to uphold Brady's four-game suspension. The ruling was an arbitration award, as Goodell was acting as an arbitrator when hearing Brady's appeal. Goodell clearly did not believe Brady, despite Brady having testified under oath. In fact, Goodell seemed even more certain of Brady's alleged wrongdoing than had Wells. Goodell stressed that, in his view, Brady was uncooperative and that Brady "destroying" his cellphone (which Brady testified was part of his ordinary practice) indicated guilt. Goodell also reasoned that a four-game suspension was appropriate given that it is the same length of suspension for use of performance-enhancing drugs. This analogy has been widely criticized given that the suspension for performance-enhancing drugs is in writing, requires direct evidence—a positive test result—and contemplates specific rules for chain of custody and review.

38. Within hours of Goodell's ruling both the NFL and Brady, through the NFLPA, filed lawsuits, with the NFL asking a federal court to uphold Goodell's arbitration award and Brady asking a federal court to vacate it. In a move that the NFL likely now regrets, the league beat Brady to the punch by filing in New York before Brady could file in Minnesota.

39. Both sides were clearly engaging in "forum shopping" where each yearned to receive a hearing before a court that would be inclined to favor it. Brady elected to file in Minnesota with the hope that his case would be heard by U.S. District Judge David Doty, who has ruled several times against the NFL including in the Adrian Peterson case. Brady's lawsuit, however, was instead assigned to U.S. District Judge Richard Kyle. The NFL picked New York mainly to avoid Judge Doty and because the league believed New York offered favorable case precedent, including in analogous cases where arbitration awards were almost always upheld. Judge Berman was assigned the NFL's lawsuit and, because the NFL had filed first, Brady's lawsuit was moved to New York. Judge Berman then announced a court schedule for August that required Brady and Goodell to attend and participate in settlement talks. Berman also allotted time for both sides to present legal arguments in court. Further, in a move opposed by the NFL, the judge ordered the release of Brady's NFL appeal hearing transcript.

40. It didn't take long for Judge Berman to signal skepticism about the NFL's case. He almost immediately expressed doubt that Brady partook in a ball deflation plot. At one point during oral arguments, Judge Berman led NFL attorney Daniel Nash to admit that there was no direct evidence of Brady's involvement. Judge Berman's focus on factual questions surprised many legal commentators. Federal law requires judges to accord high deference to the fact-finding of arbitrators (in this case, Goodell) and directs judges to focus on whether the arbitrator utilized a

reasonable process for decision-making. Judge Berman, however, repeatedly appeared mystified why the NFL would punish Brady for alleged conduct that lacked factual support.

41. After unsuccessfully imploring the parties to reach a settlement, Judge Berman announced his decision on Sept. 4, 2015—one day before Brady's suspension was set to begin. Judge Berman vacated Goodell's arbitration award, meaning Brady's suspension was lifted and he would be eligible play in Week 1 against the Pittsburgh Steelers. Although federal judges rarely vacate arbitration awards, Judge Berman believed that he was compelled to do so in Brady's case. Judge Berman concluded that Goodell had "dispensed his own brand of industrial justice" in violation of the law of the shop, which requires fair notice of punishment and consistency in how an arbitrator finds fault and determines punishments. Judge Berman highlighted three specific problems with the process used by Goodell: (1) Brady had no collectively-bargained notice that he could be suspended for "general awareness" of a ball deflation scheme; (2) Goodell unlawfully denied Brady an opportunity to cross-examine Pash, who was co-lead investigator and who edited the Wells Report before it was published; and (3) and Goodell unlawfully denied Brady an opportunity to review investigative notes, which the NFL had permitted in other player discipline matters.

42. Judge Berman declined to rule on whether Goodell was unlawfully impartial as the arbitrator, leaving the issue open should Brady v. NFL return to his court through an appellate court remand. On this issue, the NFL repeatedly stressed case precedent where federal judges upheld arbitration awards, even in instances where the judges disagreed with the arbitrator. Those cases, however, involved a neutral arbitrator, which Goodell could not have been in reviewing whether he correctly suspended Brady.

43. Some have called Brady's 2015 regular season, in which he threw for 36 touchdowns and only seven interceptions, part of a "revenge tour" against the league. Brady, who is 38 years old, statistically had one of the best seasons of his career, and it has continued into the playoffs: Brady led the Patriots to a 27–20 victory over the Kansas City Chiefs in the AFC divisional round. The Patriots have as good a shot as any team still remaining in the playoffs at winning Super Bowl 50, and one can only imagine the drama should Brady go on to win the Super Bowl MVP and receive the award on stage from Goodell. It's safe to say that any smiles exchanged between the two men would be fake.

44. Whether or not Brady plays in Super Bowl 50 and greets Goodell at Levi Stadium in Santa Clara, he will likely be seeing Goodell this spring. The NFL appealed Judge Berman's decision and on March 3, a three-judge panel on the U.S. Court of Appeals for the Second Circuit will hear oral arguments. The three judges are expected to be named on Feb. 25 and, as explained on SI.com, the pool of potential judges is varied as to whether they might be inclined to favor Brady or the NFL. Neither Brady nor Goodell will be required to attend the March 3

hearing, which will consist of one lawyer for Brady and one lawyer for the NFL each presenting a brief (most likely 10 or 15 minute) oral argument to the three judges, who can interrupt each lawyer at any time with questions. The hearing will involve no examination of evidence and no witnesses—only discussion between each lawyer and the three judges. Also, the record for the appeal will be limited to what Judge Berman considered. As a result, PSI testing by the NFL during the 2015 season will not be part of the discussion. The three judges will likely take several months to issue an opinion, which will consist of a 3–0 or 2–1 vote.

45. The odds favor Brady in the appeal. Judge Berman is only reversed about 8% of the time, and although Judge Berman's order in Brady's favor can be debated, it was logically argued. Yet don't count the NFL out; the league has retained a highly regarded legal team for the appeal, and it is banking on the fact that federal judges rarely vacate arbitration awards and thus the three-judge panel should closely scrutinize Judge Berman's decision to do so. As a twist, the three-judge panel might remand the case back to Judge Berman with new instructions for further analysis. This would mean that Brady and Goodell could be back in Judge Berman's court during the summer or fall of 2016.

**General Allegations Common to All Claims**

46. As a result of the Plaintiffs' and citizen petitioners' reasonable fears of arrest, prosecution and conviction, the Plaintiff and its citizen petitioners have been and will continue to be unable to exercise their constitutional rights to circulate initiative petitions in public locations.

47. Unless enforcement of the Defendants' unlawful policies and practices are enjoined, the Plaintiffs will suffer irreparable injury by being deprived of their teams' first round draft choice.

48. Neither the Defendants, nor any other third party, will suffer any injury if injunctive relief is issued.

49. The public interest favors the issuance of injunctive relief to protect the fundamental fairness and constitutional rights at stake in this case.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation Massachusetts Consumer Protection Act MGL Chapter 93-A**

50. Paragraphs 1 through 47 are incorporated by reference as if set forth fully herein.

51. The Defendants have breached Chapter 93A, Section 2 & 2(a) of the Massachusetts General Laws by wrongfully revoking the Patriots' 2016 first round draft choice.

52. Defendant Robert Kraft had remedies to attempt to get Plaintiffs' draft pick back, but he chose his fellow billionaire owners above the Plaintiffs and fellow fans.

53. The Patriots and quarterback Tom Brady have been basically cleared of any wrongdoing by the United States District Court in New York.

54. By denying the Patriots said draft picks as punishment without guilt or failing to fight to get the picks back, the Defendants have created an unfair method of competition for the Patriots and the consumer, when compared to the other 31 NFL franchises and consumers.

55. Accordingly, the Defendants must be restrained from taking away the Plaintiffs' first round pick in the 2016 NFL Draft, and costs and attorney's fees assessed against the Defendants.

## COUNT II
**Breach of Contract**

56. Paragraphs 1 through 53 are incorporated by reference as if set forth fully herein.

57. Plaintiffs plead that they have an implied or quasi contract with the Defendants who violated such contract by illegally revoking the Patriots first round pick.

58. Accordingly, the Defendants must be restrained from taking away the Plaintiffs' first round pick in the 2016 NFL Draft, and costs and attorney's fees assessed against the Defendants.

## COUNT III
**Tortious Interference with Contractual Relations**

59. Paragraphs 1 through 56 are incorporated by reference as if set forth fully herein.

60. As New England Patriots fans who spend a great deal of money to watch and support their team, in the form of season tickets to watch the team and cable television packages, etc., the Plaintiffs have an implied contractual relationship with the Defendants that they will not be unfairly and arbitrarily oppressed or discriminated against compared to other fans.

61. The Plaintiffs have been in fact arbitrarily and capriously discriminated against by the Defendants in taking away their first round draft pick, based on false premises and biased "investigations" and untrue "facts."

62. As fans with privity, Plaintiffs have certain contractual expectations and rights and fully anticipate in holding such expensive tickets that they will be treated fairly and not purposely be injured by Defendants.

63. Accordingly, the Defendants must be restrained from taking away the Plaintiffs' first round pick in the 2016 NFL Draft, and costs and attorney's fees assessed against the Defendants.

## COUNT IV

**Common Law Fraud**

64. Paragraphs 1 through 61 are incorporated by reference as if set forth fully herein.

65. The Plaintiffs have spent a great deal of money to support their team. They have done so under the express and implied condition and auspices that the Defendants would act ethically and fairly.

66. By arbitrarily and capriously usurping or allowing for the usurpation of the Plaintiffs' first round pick, Defendants have violated this expectation of fairness and fair dealing.

67. Furthermore, Defendants Goodell and NFL set out to "sting" the Patriots for "cheating" in some way.

68. They apparently were so focused on their sting that they "didn't want facts or truth to get in the way."

69. When they could not frame the Patriots they fabricated facts and paid $4 million to a firm to "buy" the conclusion that Tom Brady and the Patriots were guilty.

70. This was the same firm that it paid millions to bury the facts of the harms of concussions and CTE that has left many former players dead or with serious debilitating health problems, and the same firm that was hired by the tobacco industry to prove that second-hand smoke does not cause cancer.

71. Accordingly, the Defendants must be restrained from taking away the Plaintiffs' first round pick in the 2016 NFL Draft, and costs and attorney's fees assessed against the Defendants.

## COUNT V

**Negligence**

72. Paragraphs 1 through 69 are incorporated by reference as if set forth fully herein.

73. Defendants were negligent in their actions, individually and as a whole.

74. Defendant Goodell and the NFL negligently handled the framing, punishments and "investigations" of the Patriots and Tom Brady.

75. Defendant Kraft negligently did not defend Plaintiffs and the fans of the Patriots by not protecting their first round pick.

76. Accordingly, the Defendants must be restrained from taking away the Plaintiffs' first round pick in the 2016 NFL Draft, and costs and attorney's fees assessed against the Defendants.

## COUNT VI
**Intentional Infliction of Emotional Distress**
77. Paragraphs 1 through 61 are incorporated by reference as if set forth fully herein.

78. The Plaintiffs and fellow fans have dealt with a great deal of emotional distress that was intentionally inflicted by Defendants by their actions.

79. Plaintiffs have dealt with embarrassment, ridicule and depression due to the rest of the country who is jealous of the Patriots "piling on" and criticizing the Patriots and their fans for being "cheaters."

80. As Plaintiff DiMauro explains in his affidavit, the treatment, especially for fans outside of New England where there are a high number of fans from other teams, has been traumatic.

81. Defendants intentionally inflicted this distress on Plaintiffs through their intentional actions.

82. Accordingly, the Defendants must be restrained from taking away the Plaintiffs' first round pick in the 2016 NFL Draft, and costs and attorney's fees assessed against the Defendants.

## COUNT VII
**NIED**
83. Paragraphs 1 through 80 are incorporated by reference as if set forth fully herein.

84. Defendants have also been negligent by their actions in accusing the Patriots and their fans of numerous untrue allegations involving "cheating" and supporting cheaters.

85. Accordingly, the Defendants must be restrained from taking away the Plaintiffs' first round pick in the 2016 NFL Draft, and costs and attorney's fees assessed against the Defendants.

## COUNT VIII
**Violation of State and Federal Racketeer Influenced and Corrupt Organizations Act
18 U.S.C., 1961(a), (b), (c), (d)**
86. Paragraphs 1 through 83 are incorporated by reference as if set forth fully herein.

87. Defendants, by their above described acts, engaged in a pattern of racketeering activity through the performance of at least two acts of racketeering within a ten

year period through the use of the mails, and/or interstate wires as a material element of their scheme to defraud the Plaintiffs.

88. Defendants received income derived, directly or indirectly, from a pattern of racketeering activity to sue or invest or used, directly or indirectly, and part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce in violation of 18 U.S.C. 1962(a).

89. Defendants through a pattern of racketeering activity acquired or maintained, directly or indirectly, an interest in or control of an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce in violation of 18 U.S.C. 1962(b)

90. Defendants employed themselves or others in, or were, associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

91. Defendants conspired to violate subsections (a), (b), or (c), of 18 U.S.C. 1962, as described in 18 U.S.C. 1962(d).

92. The above-described enterprises consisted of a) the NFL, b) Roger Goodell, and c) Robert Kraft.

93. Defendants, by the above described acts, committed predicate acts through the use of the mails or interstate wires in furthering their fraudulent inducement of consumers of the Patriots to purchase tickets, cable and NFL Sunday Ticket by concealing their intent to violate the explicitly and implied rules and laws. Furthermore, Defendants concealed and omitted to disclose their conspiracy to fraudulently, falsely and recklessly accuse the Patriots and their fans, or allow for this, of cheating and other violative behavior expressed above and in the Brief.

94. Accordingly, the Defendants must be restrained from taking away the Plaintiffs' first round pick in the 2016 NFL Draft, and costs and attorney's fees assessed against the Defendants.


## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, for themselves and all other Patriots fans similarly situated respectfully request that this Court:

1. Enter judgment declaring that the policies and practices of the Defendants as described in this Complaint violate the rights of Plaintiffs, and may not lawfully be enforced in the future;

2. Issue a temporary restraining order and preliminary injunction prohibiting the Defendants, their employees and agents, and all persons acting under their direction, from enforcing the above referenced policies and practices, and specifically restrain Defendants from taking away the Plaintiffs' Fan Patriots first-round draft pick on or about April 28, 2016 in the NFL Draft ;

3. Grant Plaintiffs their reasonable attorney fees and costs pursuant to Massachusetts law and 42 U.S.C. §1988, et als., and other applicable laws; and

4. Grant all such other relief as this Court deems just and proper.


Dated this 4th day of April, 2016



_____/s/ Seth Carey, Esq._____
SETH T. CAREY, ESQ.
New England Patriots Fans;
Plaintiffs
BY: SETH T. CAREY, ESQ.
MB# 662718
114 Congress St.
P.O. Box 100
Rumford, ME 04276
(207) 364-7826
stcareylaw@gwi.net