IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND PATRIOTS FANS | ) CIVIL ACTION<br>) Docket No:  -CV-<br>) CIVIL ACTION |
| Plaintiffs | ) Docket No.:  -CV- |
| vs, | ) |
| | ) **BRIEF IN SUPPORT** |
| NATIONAL FOOTBALL LEAGUE, | ) **OF EXPEDITED MOTION** |
| | ) **FOR TEMPORARY** |
| and | ) **RESTRAINING ORDER** |
| | ) **AND PRELIMINARY** |
| ROGER GOODELL, COMMISSIONER, | ) |
| Individually and in his capacity as the | ) |
| Commissioner of the NFL | ) |
| | ) |
| and | ) |
| | ) |
| ROBERT KRAFT, | ) |
| Individually and in his capacity as the owner | ) |
| of the New England Patriots | ) |
| | ) |
| Defendants | ) |

## INTRODUCTION

"We are all Patriots now." –New England Patriots owner Robert Kraft after the Patriots'
victory in Super Bowl XXXVI.

With the utterance of these words, the owner of the New England Patriots honored the
traits of hard work, unselfishness, motivation and freedom which the original patriots
employed as "underdogs" to defeat the oppressive rule of one of the original
superpowers.  These are also the traits which define the New England Patriots football
team.

There is perhaps no team in sports that signifies more patriotism than the Patriots. They
won their first super bowl after the September 11, 2001 terrorist attacks on our home
land. They beat a super power of their time, the St. Louis Rams, aka, "the greatest show
on turf."  The Patriots won the game with a last minute long field goal, despite being one
of the biggest underdogs in the history of sports that year. Much like the original patriots,
the Patriots were led by a rag-tag crew of cast-offs and a rookie quarterback taken in the
sixth round. Star quarterback Tom Brady may have never even have played a down in the

NFL had the Patriots "star" #1 pick in the NFL draft not been seriously injured by the Jets' Mo Lewis with a punctured lung.

Nothing could be more reminiscent of the original patriots that became irrepressibly tired of being suppressed by a government power an ocean away. A band of ragamuffin farmers with no formal training or organization banded together against a seemingly insurmountable empire of professionally trained soldiers- *and won* simply because they had the will to win and had justice on their side and believed in themselves and their conviction that they were right and would choose death over tyranny and oppression.

The revs risked their lives to build a free society where a sports league in every major city are worth billions of dollars each, where owners enjoy trademark and monopolies where they have licenses to print money. Where a commissioner with no legal or professional playing background can be paid $35m a year to consistently make historically bad arbitrary and caprious decisions. Where television networks can make huge profits after paying the leagues billions and their sponsors paying billions to advertise 'Americas game'.

Patriots players on the surface may seem light years away from our ancestor revolutionaries, who risked everything to build a nation, but there are actually quite a few similarities. Both the original and modern-day Patriots put their lives on the line in the most violent major sport in the U.S. Careers often last mere years and most do not earn enough money in those years to not fall into poverty after their careers. One of the exceptions to the general lack of longevity of NFL players is the Patriots quarterback, Tom Brady. The revs were giant underdogs

Much like the revolutionaries in 1776 or the Patriots in 2001, your Plaintiffs in the instant matter are just regular people who believed in something and love something much bigger than them that have brought them so much joy over the years that they can't imagine life without it. We are facing a modern tyrant who has used his power in a most un-American way- to purposely, arbitrarily and capriciously hurt the New England Patriots for untoward and unfair reasons. Namely to appease jealous owners and fans of the other 31 teams who the patriots have spanked over the past 15 years.

Perhaps no one exemplifies the spirit of the founders of our nation that quarterback Tom Brady. Coming out of nowhere he led a team to an improbable Sb victory in 2001 then proved it wasn't a fluke after losing all the rest of his teammates over the years, (but not his coach) by winning 3 more. He is regularly mentioned (even by the national media who hates the patriots) as the greatest quarterback of all time. And he's not done yet. He's not done despite the NFL-related Defendants' efforts to besmirch and railroad him and his (Plaintiffs') team.

# "DEFLATEGATE"

The 2015 AFC Championship Game football tampering scandal, commonly referred to as Deflategate, was a controversy in the National Football League (NFL) involving allegation of tampering with footballs by the New England Patriots, related to the accusation that the team tampered with footballs used in the American Football Conference (AFC) Championship Game against the Indianapolis Colts on January 18, 2015. The league announced on May 11, 2015 that it would suspend Patriots quarterback Tom Brady for four games of the 2015 regular season for his alleged part in the scandal. After NFL commissioner Roger Goodell upheld the suspension in an internal appeal, the matter was moved to federal court. On September 3, 2015, Judge Richard M. Berman vacated Goodell's four-game suspension of Tom Brady, due to legal deficiencies such as inadequate notice to Brady, denial of the opportunity for Brady to examine a lead investigator, and denial of equal access to investigative files.

Deflategate, which centers on footballs thrown by New England quarterback Tom Brady in the Patriots' 45–7 trouncing of the Indianapolis Colts in the 2015 AFC championship game. Only hours after the game, as the Patriots celebrated their upcoming trip to Super Bowl XLIX, columnist Bob Kravitz of WTHR Indianapolis broke the sports story of the year: "A league source tells me the NFL is investigating the possibility the Patriots deflated footballs Sunday night."

The "possibility the Patriots deflated footballs" became a certainty for the NFL but a source of implausibility for many in the scientific community. While the NFL relied on indirect and arguably speculative evidence to conclude that the Patriots had covertly deflated footballs, Ideal Gas Law and other basic principles of science told a radically different story: the footballs' air pressure seemingly matched what the rules of physics would predict. The Patriots were severely sanctioned by the NFL and, until U.S. District Judge Richard Berman ruled otherwise, Brady similarly faced the wrath of NFL commissioner Roger Goodell.

An allegation of a quarterback cheating began with that quarterback throwing an interception:

The controversy that became known as Deflategate started when Colts linebacker D'Qwell Jackson intercepted a pass thrown by Brady in the second quarter of the AFC championship game. Colts personnel believed the football seemed a little light, and when an intern measured its air pressure, he found the intercepted football to be less than 12.5 pounds per square inch or PSI, the basic unit for measuring pressure. This was significant since NFL rules require that game footballs fall within a range of 12.5 to 13.5 PSI. Those rules also assign a minimum penalty of a $25,000 fine to those who tamper with game footballs' air pressure and other qualities. The NFL regulates the PSI of footballs to ensure uniformity in how games are played and, although many football players downplay its competitive significance, slightly under-inflated footballs may be easier to catch. Richard Berman ruling, pp. 20-21

Background

The official rules of the National Football League require footballs to be inflated to a gauge pressure between 12.5 and 13.5 pounds per square inch (psi) or 86 to 93 kPa, when measured by the referees. The rules do not specify the temperature at which such measurement is to be made. Official Playing Rules of the National Football League – Rule 2-1". National Football League. October 25, 2013. Retrieved January 26, 2015. Per the pressure-temperature law, there is a positive correlation between the temperature and pressure of a gas with a fixed volume and mass. Thus, if a football were inflated to the minimum pressure of 12.5 psi at room temperature, the pressure would drop below the minimum as the gases inside cooled to the colder ambient temperature on the playing field. While footballs deflate naturally in colder temperatures, a deliberately under-inflated football may be easier to grip, throw, and catch, or inhibit fumbling, especially in cold rainy conditions. Manfred, Tony (January 21, 2015). "Why Using Deflated Footballs Gave The Patriots A Huge Advantage". Business Insider. Retrieved January 27, 2015.

Prior to 2006, NFL custom was for the home team to provide all of the game footballs. In 2006, the rules were altered so that each team uses its own footballs while on offense. Teams rarely handle a football used by the other team except after recovering a fumble or interception. Tom Brady, quarterback of the New England Patriots, along with Peyton Manning, who was quarterback of the Indianapolis Colts in 2006, argued for the rules change for the express purpose of letting quarterbacks use footballs that suited them. Rakov, Abe (November 28, 2006). "Brady, Manning convince NFL to allow offenses to use own footballs on the road". Sun-Sentinel. Retrieved January 24, 2015.

Early reports suggested that the Indianapolis Colts and Baltimore Ravens first suspected that the footballs the Patriots were using in the games against each team might have been deliberately underinflated to gain an illegal advantage during the 2014 NFL regular season, "NFL was ready to check New England Patriots' footballs against Colts, report says - Newsday". Newsday. Retrieved May 6, 2015. "Report: Colts Raised Concerns About Under-Inflated Balls After Game vs. Patriots in Indianapolis". Boston.com. Retrieved May 6, 2015. Although Baltimore head coach John Harbaugh denied reports concerning the Ravens. Hensley, Jamison (February 1, 2015). "Ravens didn't tip off Colts about PSIs". ESPN. Retrieved April 12, 2015.

AFC Championship Game

The American Football Conference (AFC) Championship Game for the 2014 season was played on January 18, 2015, at Gillette Stadium in Foxborough, Massachusetts, home of the New England Patriots, who hosted the Indianapolis Colts. Both teams had the chance to play in Super Bowl XLIX. Prior to the game, the Colts had notified the NFL that they suspected the Patriots were underinflating balls, but provided no specific factual information. Wells Jr., Theodore V. (May 6, 2015). "INVESTIGATIVE REPORT CONCERNING FOOTBALLS USED DURING THE AFC CHAMPIONSHIP GAME ON JANUARY 18, 2015" (PDF). National Football League. Retrieved May 7, 2015.

During the first half of the AFC Championship Game, Patriots quarterback Tom Brady threw an interception to Colts linebacker D'Qwell Jackson. After the play was over,

Jackson handed the ball to the Colts equipment manager for safekeeping as a souvenir. Early reports suggested that Jackson was first to suspect the ball was deflated, but Jackson said he did not notice anything wrong with the ball he caught. Weinfuss, Josh (January 22, 2015). "D'Qwell Jackson didn't notice weight". ESPN.com. Retrieved April 12, 2015. Jackson says he actually did not even know the ball was taken or that the controversy existed until he was being driven home from the team's charter plane after the Colts had arrived in Indianapolis. I wouldn't know how that could even be an advantage or a disadvantage," Jackson said. "I definitely wouldn't be able to tell if one ball had less pressure than another." Darlington, Jeff (January 22, 2015). "Colts' D'Qwell Jackson: I didn't know football had less pressure". National Football League. After Jackson's interception, a Colts equipment manager measured the pressure of the ball on the sideline, even though this is prohibited (though the Colts were not penalized), and the team notified NFL Gameday Operations that the ball measured below the permissible range.

At halftime, NFL officials inspected the footballs. Ex-NFL ref Gerry Austin initially, and incorrectly, stated that eleven of the twelve balls used by the Patriots were measured to be two pounds per square inch below the minimum amount, Travis Durkee (January 21, 2015). "Ex-NFL referee: All 12 Patriot footballs were underinflated". Sporting News. Dubin, Jared (January 20, 2015). "Report: NFL finds 11 footballs were under-inflated in AFC title game". CBSSports.com. but later reports refuted this allegation, citing only a single ball two pounds per square inch below the minimum. Rappaport, Ian (February 1, 2015). "More details on the investigation of Patriots' deflated footballs". NFL.com. Retrieved February 2, 2015.

According to NFL official Dean Blandino, referees do not log the pressure of the balls prior to the game, or check during the game, and did not do so in this case. Walt Anderson, the referee, gauged the footballs. The Patriots' game balls were re-inflated at halftime to meet specifications and were reintroduced into the game. Howe, Jeff (January 29, 2015). "Dean Blandino: Referee doesn't document football PSI levels". Boston Herald. Retrieved January 29, 2015.

No issues were raised on the pressure of the footballs used in the second half. Schwab, Frank (January 20, 2015). "How did Colts know Patriots' balls weren't inflated? And Gronk takes blame". Yahoo! Sports. "Deflate-gate: Bill Belichick says Patriots have followed every rule". BBC Sport. January 24, 2015. The pressures of four of the Colts' footballs were measured at halftime using two gauges, and were found to be within regulation on one of the two gauges, but not on the other gauge. The remainder were not measured because, according to the Wells Report, "the officials were running out of time before the start of the second half."

The Patriots led 17–7 at the half; in the second half, the Patriots scored 28 unanswered points for a final score of 45-7. "NFL Game Center". National Football League. January 18, 2015. Retrieved May 12, 2015.  It was the 50th win by the Patriots in the rivalry. Given the crushing victory by the Patriots, there is a consensus that the Colts would still

have massively lost even were the footballs properly inflated. Colts' Allen says Patriots could have used 'soap for balls' and still won, Fox Sports.

Investigation

The National Football League began an investigation into the under-inflation of the game balls. McLaughlin, Eliott (January 23, 2015). "What the heck is Deflategate anyway?". CNN. Susanna Kim; Aaron Katersky (January 19, 2015). "Deflategate: NFL Probing Whether New England Patriots Used Deflated Balls". ABC News. The report of the investigation was released in May 2015. See Wells Report.

On January 22, Patriots Head Coach Bill Belichick indicated that he did not know anything about the balls being under-inflated until the day after the event, and that the New England Patriots would "cooperate fully" with any investigation. Pepin, Matt (January 22, 2015). "Bill Belichick says he has 'no explanation' for Deflategate". Boston Globe. Retrieved January 22, 2015.He said, "When I came in Monday morning, I was shocked to hear about the news reports about the footballs. I had no knowledge of the situation until Monday morning. [...] I think we all know that quarterbacks, kickers, specialists have certain preferences on the footballs. They know a lot more than I do. They're a lot more sensitive to it than I am. I hear them comment on it from time to time, but I can tell you, and they will tell you, that there's never any sympathy whatsoever from me on that subject. Zero. [...] Tom's personal preferences on his footballs are something that he can talk about in much better detail and information than I could possibly provide. Id.

Patriots quarterback Tom Brady initially referred to the accusations as "ridiculous". Meghan Keneally; Susanna Kim; Aaron Katersky (January 19, 2015). "Deflate-Gate: New England Patriots Coach Says Team Will Cooperate With Probers". ABC News. Retrieved April 12, 2015. Brady also held a news conference on January 22, prepping his team with a talk beforehand. He denied any involvement and stated that the National Football League had not contacted him in regard to their investigation. Alper, Josh (January 22, 2015). "Tom Brady: NFL hasn't contacted me as part of investigation". NBC Sports. Retrieved April 12, 2015. He went on to say that he was handling the situation before the Super Bowl. "Tom Brady: Press Conference - YouTube". YouTube. HeadSmart Labs found that similar weather changes caused an average 1.8 psi drop in football pressure. HeadSmart Labs. "HeadSmart Labs' Study Scientifically Demystifies Deflategate". Sport Techie. Retrieved 5 June 2015.

They also reported that the air in an electric pump could reach 130 °F.

On January 27, an anonymous league source stated that the investigation was focusing on a Patriots locker room attendant who was seen on surveillance video taking the 24 game footballs (12 from each team) into a restroom for approximately 90 seconds. This video was provided to the NFL by the New England Patriots the day after the 45-7 Patriots victory. "NFL looking at Patriots attendant". ESPN.com. January 27, 2015.

Dean Blandino, NFL head of officiating, confirmed on January 29 that the NFL checks, but does not log, the pre-game pressure of each football, and that there is therefore no record of where in the 12.5 to 13.5 pound range each Patriot and Colt football was before the game. Smith, Michael David (January 29, 2015). "NFL didn't log the PSI of each Patriots football". NBC Sports. In the same news conference, referee Bill Vinovich said:

"We test them. It's 12.5 to 13.5. We put 13 in every ball. ... Dean tested a couple in the office and had one underinflated and one to specs, and you really couldn't tell the difference unless you actually sat there and tried to squeeze the thing or did some extraordinary thing. If someone just tossed you the ball, especially in 20 degree weather, you're going to pretty much play with the ball. They are going to be hard. You're not going to notice the difference. Reiss, Mike (January 29, 2015). "Learning more on how referees test and document football air pressure". ESPN.

Additional details released by the NFL on February 1 confirmed that only one of the twelve balls, the intercepted ball,[not in citation given] was deflated by two psi, and that many balls were under inflated by "just a few ticks".Rapaport, Ian (February 1, 2015). "More details on the investigation of Patriots' deflated footballs". NFL.com

The investigation also found that officials noticed during the game that a game ball was missing, and two different officials handed replacement balls to a Patriots equipment manager. One of those officials was reportedly fired from the NFL for selling game balls for personal profit, though the NFL denied this claim. Matt Fitzgerald. "NFL". Bleacher Report.

Origin of the investigation

Ryan Grigson, speaking at the 2015 NFL Combine, stated that "prior to the AFC Championship Game, we notified the league about our concerns that the Patriots might be using under-inflated footballs". Hubbuch. Bart (February 20, 2015). "There's a glaring contradiction in NFL's Deflategate timeline". New York Post. According to the NFL's investigation, "Grigson, Sullivan, and other members of the Colts equipment staff referenced the Colts Week 11 game against the Patriots in Indianapolis. During that game, Colts strong safety Mike Adams intercepted two passes thrown by Tom Brady… the intercepted footballs appeared to be coated in a tacky substance and seemed spongy or soft when squeezed." Wells Report. A New York Post article noted that Grigson's claim implied that the NFL had advance knowledge of the issue and was trying to run a sting operation, contradicting Dean Blandino's claim that it was an issue that "came up in the first half", Id. The claim also contradicts NFL executive vice president of football operations Troy Vincent's statement that Grigson notified the league "during the second quarter of the game". Brinson, Will (February 3, 2015). "Ryan Grigson tipped NFL off to deflated balls in Patriots-Colts". CBS Sports.

Wells Report

On January 23 the NFL tapped Manhattan attorney Ted Wells to "get to the bottom of Deflategate." Wells previously had worked with the NFL to "get to the bottom" of the Miami Dolphins bullying scandal between Richie Incognito and Jonathan Martin. In a

press release, following the league's decision to hire Wells, the NFL claimed that the investigation "will be thorough and objective, and is being pursued expeditiously" with league Executive Vice President Jeff Pash working along with Wells in coming in the review of the impending issue. Gershman, Jacob (2015-01-23). "NFL Taps Attorney Ted Wells to Lead 'Deflategate' Probe". WSJ Blogs - Law Blog. Many, especially the New England media, questioned exactly how "independent" Wells could truly be, as a result of his history with the NFL. Rather they, the naysayers, wanted to see a truly independent investigator, someone without ties to the NFL, to investigate this scandal as they felt the Patriots were at a disadvantage with the hiring of Wells.[citation needed] Finally after four months of waiting the NFL published a 243-page investigative report regarding the deflation of footballs used in the AFC Championship game on May 6, 2015. Wells Report. This report is known as the Wells Report. The report is officially entitled Investigative Report Concerning Footballs Used During the AFC Championship Game on January 18, 2015, named for its leading author, attorney Theodore V. Wells, Jr., of Paul, Weiss, Rifkind, Wharton & Garrison. The investigation concluded that it was "more probable than not" that New England Patriots equipment personnel were deliberately circumventing the rules. Wells Report at 122.  Further, Brady was implicated as it being more probable than not that he was "generally aware" of the deflation. Wells Report:122. The report further stated that Belichick and other members of the coaching staff were not involved in the situation. Id at 122. The report focuses on the communications and actions of locker-room attendant Jim McNally and equipment assistant John Jastremski. The report concludes it was "more probable than not" that the two deliberately released air from Patriot game balls after they were tested by game officials. In several texts between Jastremski and McNally, the two mention and joke about inflation, deflation, needles, and gifts from Tom Brady to McNally. Tom Brady was a constant reference point in these discussions. McNally referred to himself as "the deflator" in a text message to Jastremski as far back as May 2014. Id.:75

The Wells Report relied on scientific analysis performed by Exponent and supported by Dr. Daniel Marlow, a professor of Physics at Princeton University. This analysis concluded that within the range of game conditions and circumstances studied, no set of environmental or physical factors could account for the loss of air pressure exhibited by the Patriots game balls. The scientific study supported the report's conclusion that the loss of air pressure may be accounted for by human intervention. Id.:130–31
Physics argument

The Wells report physics argument, based on multiple experiments as well as theoretical modeling, runs as follows. Id.:Appendix 1, 63-68 Several conjectured sources of variability (differences in game use, alleged "vigorous rubbing" by the Patriots before play, leakage during the game, and variations in football volume) can be set aside as they have no discernable effect. Based on documented habit, as well as the recollections of referee Walt Anderson, the Patriots balls were (as usual) set around 12.5 psi, and the Colts balls around 13.0 psi, before their games. The ideal gas law shows that footballs inflated in a warm environment will drop in pressure in a cold environment; however, a football is not a thermos, and the footballs would have rapidly started to re-inflate when taken to the officials' locker room for halftime testing. (Wells estimates that the Patriots

balls had 2-4 minutes to repressurize before measurements began; the measurements themselves spanned an estimated 4-5 minutes. Id.:70) Most or all of the Patriots and Colts footballs should have mostly warmed up to room temperature and substantially reinflated by the time each measurement occurred. In addition, there is a minor problem of variability: to give one example, it is hard for a temperature-based theory to explain why Patriots ball #2 tested fully 0.6 psi lower than Patriots ball #1, when both ball #1 and #2 started before the game at the same psi. If temperature is the major factor, the Patriots psi should stay roughly the same, or gradually increase, as subsequent balls are tested; instead, the psi of the footballs changed substantially from one ball to the next. (However, Wells acknowledges that the variability test does not, on its own, reach the level of statistical significance; therefore the conclusion is based on the magnitude of the drop, rather than the variability.)

Besides temperature-based deflation and the timing of the measurements, the condition of a ball's surface (wet vs. dry) also has a small but detectable effect on the measured pressure; there can also be minor measurement error caused by the gauges. During half-time, the referees used two gauges on each ball: the same Non-Logo Gauge that Wells believes to be have been used by Anderson before the game to confirm the pre-game pressure, and an additional Logo Gauge. The Logo Gauge appears to consistently run at least 0.35 psi above the (accurately calibrated) Id.:Appendix 1, 45 non-Logo gauge, but both were determined to be extremely consistent and precise. In particular, the Logo gauge is inaccurate (it runs high) but is precise (it consistently runs high by the same amount every time), and therefore can be used as additional confirmation that the non-Logo measurement is correct (with the exception of Colts ball #3, below). Wells believes that Blakeman and Prioleau used the Non-Logo and Logo gauges respectively in the Patriots half-time tests, and that the two of them switched gauges with each other for the Colts half-time test.

Even with the combined effect of wet vs. dry balls, temperature-based deflation from the 50-degree Fahrenheit halftime game weather followed by partial temperature-based re-inflation inside the warm locker room, and errors in measurement, Wells concluded that, while there is no absolute certainty, there is no known "set of credible environmental or physical factors that completely accounts" for the total measured air loss.

Below are the half-time football measurements, by team and referee: Id: 68-69

| Patriots ball | Blakeman | Prioleau |
| --- | --- | --- |
| #1 | 11.50 | 11.80 |
| #2 | 10.85 | 11.20 |
| #3 | 11.15 | 11.50 |
| #4 | 10.70 | 11.00 |
| #5 | 11.10 | 11.45 |
| #6 | 11.60 | 11.95 |
| #7 | 11.85 | 12.30 |
| #8 | 11.10 | 11.55 |
| #9 | 10.95 | 11.35 |

| #10 | 10.50 | 10.90 |
| #11 | 10.90 | 11.35 |

| Colts ball | Blakeman | Prioleau |
| --- | --- | --- |
| 1 | 12.70 | 12.35 |
| 2 | 12.75 | 12.30 |
| 3* | 12.50 | 12.95 |
| 4 | 12.55 | 12.15 |

Exponent believes the measurements for Colts ball 3 involve some sort of transcription error by the original NFL transcriber, as it is only row that reverses the usual Logo vs. Non-Logo differential.

Reactions to the report

Following the release of the report many commentators in other markets said it proved its case. On the other hand Patriots fans, and New England media, tore into the report for various reasons including phrases like "more probable than not" and "generally aware" in relation to Tom Brady's knowledge of the situation, and the decision to write the report in a way that minimizes the NFL's wrongdoing in relation to the air pressure of the footballs. "Everything wrong with Wells Report". Thornography. New England fans were furious at ESPN, especially at Chris Mortenson, for broadcasting news stories that were seen as painting the Patriots in a negative light. "Sources: 11 of 12 Pats footballs underinflated". ESPN.com.. Mark Brunell and Jerome Bettis strongly criticized Brady on ESPN, saying that based on their playing experience it was unlikely that the balls had been underinflated without Brady's awareness. Bieler, Des (2015-01-22). "Mark Brunell and other ex-players crushed Tom Brady on ESPN". The Washington Post. ISSN 0190-8286.

Dated May 6, 2015, in reaction to the Wells Report, the New York Times ran a story "In the End, Science Works Against the Patriots." The story took the position that the Patriots almost certainly cheated, and that the proof of it is that when accounting for warming during half-time prior to measurement, the ideal gas law could not explain the Patriots' football pressure. "In the End, Science Works Against the Patriots". The New York Times.

On May 7, when asked to comment on the report, Brady stated that he had no reaction since the report was 30 hours old, he was still "digesting the report", and he hoped to comment more fully in the future. "Tom Brady says he's still digesting 'Deflategate' report". CNN. Retrieved May 7, 2015. He also referred back to owner Robert Kraft's comments following the release of the report. "Patriots owner Robert Kraft releases defiant statement defending his team after the NFL nailed them for deflategate". businessinsider.com. Business Insider. Brady's agent Don Yee criticized the report stating investigators jumped to conclusions. "Deflategate Report: Tom Brady's Agent Slams Findings, Says Investigators Jumped to Conclusions". abc.news.go.com. ABC News. On May 12, lead author Ted Wells defended the report, indicating text messages between Patriots game-day employees Jim McNally and John Jastremski about Brady were more

than circumstantial evidence to implicate Brady. "Ted Wells sure of Tom Brady's guilt, defends integrity of report". Sportingnews.com.

On May 14, attorney Daniel L. Goldberg prepared a document rebutting specific charges made in the Wells Report, "The Wells Report in Context". Wellsreportcontext.com, citing Nobel Prize winning scientist Roderick MacKinnon, who has financial ties to Robert Kraft.  "Patriots' Deflategate rebuttal included scientist with financial ties to owner Bob Kraft". Washingtonpost.com. Goldberg has represented the Patriots and was present during all of the interviews of Patriots personnel conducted at Gillette Stadium. "The Patriots made a truther website about the Wells Report". msn.com.

In June 2015, the American Enterprise Institute, a conservative think tank utilizing the ideal gas law as a basis for their report, "Hacks Desperately Try To Disprove Deflategate" released an independent scientific analysis that concluded that the Wells Report was "deeply flawed" and that "[i]t is ... unlikely that the Patriots deflated the footballs." Hassett, Kevin; Sullivan, Joseph; Veuger, Stan (June 12, 2015). "On the Wells Report". AEI Economic Perspectives. The report noted the lack of evidence of a pressure rise during the measurements and used it to challenge the timing assumptions and thus the question of how much warming happened to Patriots and Colts footballs, and thus the question of whether the pressure differences could be explained by science. The NFL responded that timing still could not explain the pressure declines." Goodell, Roger (June 12, 2015). "Final Decision on Article 46 Appeal of Tom Brady"

On August 19, 2015, New York Law School professor and self-described Patriots detractor Robert Blecker posted an article "DeflateGate: the Smoking Gun", in which he looked at pictures in the Wells report and concluded that they had been deliberately staged to make the referee's recollection about which gauge was used appear less reliable. 60 Minutes Sports later interviewed professor Blecker and showed the pictures. Blecker, Robert (August 19, 2015). "DeflateGate: The Smoking Gun".

On August 26, 2015, self-described Patriots fan Robert F. Young posted online a letter he sent to the Judge reviewing the Tom Brady suspension. Young, Robert (August 25, 2015). "Permission requested to file AMICUS CURIAE IN OPPOSITION TO THE NFL'S MOTION TO CONFIRM ARBITRATION AWARD".  It requested permission to file an amicus brief. The judge posted the letter to the official court docket on September 10, 2015. The Wall Street Journal reported on Mr. Young's work being on the docket on September 17, 2015.  Gershman, Jacob (September 17, 2015). "The 'Deflategate' Judge's Unusual Fan Mail". The letter asserted that the lack of pressure rise noted by the American Enterprise Institute report was due not to timing differences but rather due to the science firm used in the Wells Report, Exponent, deliberately rigging the warming test to produce too high a result, as compared to the game-day events, by not properly simulating how on game-day the Patriots footballs had remained in the bag. The letter summarized how it claimed the Exponent appendix to the Wells report provides sufficient proof of the deception and that the fundamental conclusion that the Patriots ball pressure could not be explained by science was a lie on the part of Exponent.

On August 26, 2015, Robert F. Young posted online the 59-page amicus brief that he sent to the court. Young, Robert (August 25, 2015). as submitted.pdf "ROBERT F. YOUNG'S AMICUS CURIAE IN OPPOSITION TO THE NFL'S MOTION TO CONFIRM ARBITRATION AWARD".   Judge Richard M. Berman posted the brief to the official court docket on September 9, 2015 and it was subsequently noted and linked to by the Wall Street Journal on September 17, 2015. Gershman, Jacob. In addition to providing the supporting detail behind the letter, it used heat flow theory to calculate that the warming difference caused by the bag on game day was sufficient to completely explain the difference between the NLF/Exponent simulation results based on the referee's recollection of the gauge and the actual Patriots ball pressures.

The brief examined each reason given by Exponent for not believing the ref regarding the question of which gauge had been used pre-game, arguing why Exponent would not have actually believed each reason it gave. It noted an observation by New York Law School professor Robert Blecker that Exponent's timing assumption for the Colts footballs had no basis in information provided by the NFL and was not explained in any way. It noted that with the more generally agreed timing assumption of the Colts balls having been tested at the last minute, the Exponent experimental simulation data was inconsistent with disbelieving the ref and consistent with believing the ref. Combining the above it argued that the Exponent work, when properly understood, shows that to the best that can be known by the science known to Exponent, the evidence proves that no air was improperly removed from the Patriots footballs.

On August 30, 2015, Robert F. Young posted a pictorial summary of the issues mentioned in his amicus brief. The summary included experimental data from patriots fan Mike Greenway, not part of the brief, showing that even a dry bag, partially open, was sufficient to slow warming of even a football in the top of the bag by 2.5x relative to the Exponent experimental work. Young, Robert (August 30, 2015). "Simple pictures (to show Exponent knew Pat's ball pressure was fine)".

On August 31, 2015, in a wbur.org "Cognoscenti" op-ed piece, Blecker, Robert (August 31, 2015). "DeflateGate, And The Patriots' False Appearance Of Guilt"  New York Law School Professor Robert Blecker, self-described Patriots detractor, explained how he believes the NFL and Exponent had been deceptive regarding crucial evidence, and that he believes that most likely no cheating was committed by the Patriots. The op-ed mentions that the "expert accusers" (Exponent) ignored the effect of the balls having remained in the bag on game day. The op-ed linked to Robert F. Young's website deflategate landing page, Young, Robert (August 31, 2015). "Better Dialogue re: #DeflateGate" for further proof of the bag issue.

On September 13, 2015, NY Professor Robert Blecker claims that the NFL investigation was completely biased against the Patriots during an interview on 60 Minutes. He states that the gauges used to measure the footballs at halftime were Walt Anderson's personal gauges and that, "if you want to know how much something has dropped, you've got to measure it with the same gauge before the game as you do at halftime." Robert Blecker also noted that the side-by-side comparison of the two gauges shown in the Wells Report

were different sizes. In addition to that, the picture also showed that the NFL measured the 2 needles at different spot to make the smaller needle appear longer. According to Robert Blecker, the different needle sizes resulted in one gauge reading at a constant measure of about 0.4 PSI higher than the other.  Oliver Thomas, "New York law professor: Deflategate 'based on a tissue of lies'", CBS Sports, September 17, 2015. On December 14, 2015; Blecker filed an amicus curiae brief accusing the NFL of "infected with bias, unfairness, evident partiality and occasional fraud".  Rohrbach, Ben (2015-12-18). "N.Y. law professor files deflate-gate brief accusing NFL of fraud | Shutdown Corner - Yahoo Sports". Sports.yahoo.com, (http://web.archive.org/web/20151222085237/http://thewhitebronco.com/wp-content/uploads/2015/12/Deflategate-Amicus.pdf. Archived from the original (PDF) on December 22, 2015.

On November 25, 2015, MIT Professor John Leonard posted a lecture on YouTube titled "Taking the Measure of Deflategate" in which he explains why he believes the Exponent portion of the Wells Report contains technical failures that caused the report to incorrectly conclude that environmental factors alone could not have explained the changes in air pressure. "MIT Professor Debunks Deflategate". YouTube. 2015-12-01. Leonard walks through the ideal gas law calculations, highlighting mistakes others made when doing similar calculations by not using absolute pressure, and concludes that the Patriots' footballs met the ideal gas law prediction.

   "If I had to stake my reputation and my career on it, the Patriots balls match the Ideal Gas Law prediction, and I don't know why people can't get that." - John Leonard, "Taking the Measure of Deflategate" @ 47:37

Leonard then pointed out inconsistencies in the Exponent report regarding the effect of wetness on volume, and cited one study by Thomas Healy, a graduate student at Carnegie Mellon, that showed up to a three percent increase in volume if the balls are wet.  Glanz, James (2015-01-29). "Deflation Experiments Show Patriots May Have a Point After All". The New York Times. ISSN 0362-4331.  Leonard agreed with previous analysis that showed slowed warming of balls when kept in a bag which; something he claims the Exponent reports ignores. He also details technical failures of the transient analysis in the Exponent report which do not show a slower rate of warming for wet balls and contain incorrect "amplitudes" in the graphs which underrepresented the total warming of both the Colts and Patriots balls. Leonard, John (2015-11-25). "Deflategate transient analysis". YouTube. John Leonard.

## Sanctions by the NFL and appeals

### Tom Brady

On May 11, 2015, the NFL announced that it suspended Tom Brady without pay for four games of the upcoming season for his involvement, based on "substantial and credible evidence" that Brady knew Patriots employees were deflating footballs and that he failed to cooperate with investigators.  Rosenthal, Gregg (May 11, 2015). "Patriots' Tom Brady suspended 4 games". National Football League. The Patriots were also fined $1 million

and lost their first round pick in the 2016 NFL draft and their fourth round pick in the 2017 NFL draft. NFL Executive Vice President of Football Operations Troy Vincent's May 11 letter to Brady stated in part: "Your actions as set forth in the report clearly constitute conduct detrimental to the integrity of and public confidence in the game of professional football."   "NFL releases statement on Patriots' violations". National Football League. May 11, 2015. Retrieved May 12, 2015.  Troy Vincent's letter further stated: "With respect to your particular involvement, the report established that there is substantial and credible evidence to conclude you were at least generally aware of the actions of the Patriots' employees involved in the deflation of the footballs and that it was unlikely that their actions were done without your knowledge. Moreover, the report documents your failure to cooperate fully and candidly with the investigation, including by refusing to produce any relevant electronic evidence (emails, texts, etc.), despite being offered extraordinary safeguards by the investigators to protect unrelated personal information, and by providing testimony that the report concludes was not plausible and contradicted by other evidence." Id.

The NFL also announced a three-day appeal deadline for charges against Brady specifically according to the 2011 collective bargaining agreement, and a deadline of May 21 for charges against the team.  Rosenthal, Gregg (May 11, 2015). "Brady suspended 4 games; Patriots forfeit 2016 first rounder". National Football League. Brady's agent indicated the suspension will be appealed.   "Brady to appeal suspension; Agent calls discipline 'ridiculous'". wcvb.com. May 11, 2015. Retrieved May 11, 2015. The Patriots suspended Jim McNally and John Jastremski indefinitely on May 6, with the NFL indicating that the pair could not be rehired without the league's approval.  Gantt, Darin (May 11, 2015). "The Deflator, Pats equipment assistant suspended indefinitely". NBC Sports. Patriots owner Robert Kraft issued a statement stating the punishment "far exceeded" reasonable expectation, was based on circumstantial evidence, and that Tom Brady had his unconditional support.   "Kraft: DeflateGate Punishment 'Far Exceeded' Reasonable Expectation". WBZ-TV. May 11, 2015. After Judge Berman vacated the Brady suspension, the Patriots requested that Jastremski and McNally be reinstated; the NFL officially did so on September 16, 2015. "Patriots Ask NFL To Reinstate Team Employees John Jastremski, Jim McNally". NESN. September 9, 2015. "NFL Reinstates Patriots Employees John Jastremski, Jim McNally From Suspension". NESN. September 16, 2015

Commentary on the initial punishment was mixed. Bleacher Report referred to the penalties as "brutal." Mike Freeman (11 May 2015). "NFL Deflategate Message: No Player Is Above the Rules, Not Even Tom Brady". Bleacher Report.. Various commentators also inferred that the prior reputation of the Patriots organization as a team that bends rules appeared to factor into the harshness of the punishment. Id. See Eric Adelson (11 May 2015). "Tom Brady allowed the new NFL Way to smack Patriot Way in stunning fashion". Yahoo! Sports. "Somewhere along the line, the debate over what happened in the hours and minutes leading up to the AFC championship game in January went beyond air pressure and weather conditions, and became a referendum on the character of Tom Brady and his franchise." Others described the punishment as "firm but

fair." O'Connor, Ian. "Tom Brady should skip appeal, tell truth now". ESPN.com. ESPN
Internet Ventures. Retrieved 12 May 2015.


After NFLPA filing an appeal

On May 14, the National Football League Players Association (NFLPA) filed an appeal
of Tom Brady's four-game suspension.  "NFLPA appeals Patriots QB Tom Brady's four-
game suspension". ESPN.com. The NFL also announced Roger Goodell would preside
over Brady's appeal, despite objections from the NFLPA, which requested a neutral
arbitrator. Lindsay H. Jones. "Roger Goodell to preside over Tom Brady's appeal of
Deflategate suspension". USAToday.com.

On May 19, Robert Kraft told media at an NFL owners meeting that he does not plan on
appealing the penalties imposed on the team; that decision had no impact on the NFLPA's
appeal on behalf of Brady. Also, Patriots fans held a "Free Brady" rally at Gillette
Stadium on May 26, 2015. Walder, Seth (2015-05-19). "Kraft says Patriots won't appeal
DeflateGate penalties". Nydailynews.com. Reiss, Mike (19 May 2015). "Robert Kraft:
Patriots won't appeal Deflategate punishment". ESPN.com. ESPN Internet Ventures.

On June 23, Tom Brady appealed his suspension before Roger Goodell at the NFL's
offices in New York City in a 10-hour-long hearing. Don Melvin. "Tom Brady's
'Deflategate' appeal hearing ends after 10 hours". CNN.com.

After appeal hearing
On July 28, Goodell announced that he had upheld the four-game suspension, citing
Brady's destruction of his cell phone as a critical factor: "On or shortly before March 6,
the day that Tom Brady met with independent investigator Ted Wells and his colleagues,
Brady directed that the cell phone he had used for the prior four months be destroyed,"
the league statement read. "He did so even though he was aware that the investigators had
requested access to text messages and other electronic information that had been stored
on that phone. During the four months that the cell phone was in use, Brady had
exchanged nearly 10,000 text messages, none of which can now be retrieved from that
device. The destruction of the cell phone was not disclosed until June 18, almost four
months after the investigators had first sought electronic information from Brady."
Rosenthal, Gregg (July 28, 2015). "Roger Goodell upholds Tom Brady suspension".
National Football League. Gantt, Darin (July 28, 2015). "Goodell cites destroying phone
in upholding Tom Brady's suspension". NBC Sports.   The NFL also filed papers in
Manhattan federal court seeking to confirm Roger Goodell's decision. Armstrong, Kevin;
et al. (July 28, 2015). "NFL hopes to have expected Tom Brady lawsuit in New York and
not Minnesota". New York Daily News.

On July 29 the NFL Players Association (NFLPA) announced that they filed an
injunction in Minnesota that would prevent the NFL from enforcing the four-game
suspension that Commissioner Roger Goodell confirmed.  Hanzus, Dan (July 29, 2015).
"What's next in Tom Brady's legal fight?". NFL.com. National Football League.

Belson, Ken. "Brady vows to fight suspension, says he 'did nothing wrong' in Deflategate scandal". The Globe and Mail (The Globe and Mail).  On July 30, a Minnesota judge ordered the lawsuit be transferred to the Southern District of New York. "Tom Brady's suspension appeal is in federal court". CBS News. July 30, 2015

After motions filed in court by NFL and NFLPA
On July 29, Brady released a statement on his Facebook page criticizing Goodell's decision to uphold the suspension, stating in part (emphasis in the original):

*"I am very disappointed by the NFL's decision to uphold the 4 game suspension against me. I did nothing wrong, and no one in the Patriots organization did either. Despite submitting to hours of testimony over the past 6 months, it is disappointing that the Commissioner upheld my suspension based upon a standard that it was "probable" that I was "generally aware" of misconduct. The fact is that neither I, nor any equipment person, did anything of which we have been accused. I also disagree with yesterdays narrative surrounding my cellphone. I replaced my broken Samsung phone with a new iPhone 6 AFTER my attorneys made it clear to the NFL that my actual phone device would not be subjected to investigation under ANY circumstances. As a member of a union, I was under no obligation to set a new precedent going forward, nor was I made aware at any time during Mr. Wells investigation, that failing to subject my cell phone to investigation would result in ANY discipline.*

*Most importantly, I have never written, texted, emailed to anybody at anytime, anything related to football air pressure before this issue was raised at the AFC Championship game in January. To suggest that I destroyed a phone to avoid giving the NFL information it requested is completely wrong. To try and reconcile the record and fully cooperate with the investigation after I was disciplined in May, we turned over detailed pages of cell phone records and all of the emails that Mr. Wells requested. We even contacted the phone company to see if there was any possible way we could retrieve any/all of the actual text messages from my old phone. In short, we exhausted every possibility to give the NFL everything we could and offered to go thru the identity for every text and phone call during the relevant time.*

*He dismissed my hours of testimony and it is disappointing that he found it unreliable...I will not allow my unfair discipline to become a precedent for other NFL players without a fight."*

Orr, Conor (July 29, 2015). "Tom Brady responds to Roger Goodell's ruling". National Football League. Kerr-Dineen, Luke (July 29, 2015). "Tom Brady rips the NFL's Deflategate decision on his Facebook page". USA Today Sports.

Patriots owner Robert Kraft also stated at a news conference that "I was wrong to put my faith in the league" and apologized to the team's fans for accepting the "harshest penalty in history of NFL for an alleged ball violation" because he thought that cooperating would help exonerate Brady. Almasy, Steve. "Tom Brady and Patriots owner attack NFL over 'Deflategate' decision". CNN.com (CNN). Davis, Nate (July 29, 2015). "Robert

Kraft blisters NFL for upholding Brady suspension, apologizes to fans". USAToday.com. USA Today.

The Patriots released email exchanges between the Patriots organization and the NFL on July 31, 2015. The emails, beginning in February 2015, show the Patriots' frustration over the NFL's failure to investigate the source of leaks, which turned out to consist largely of incorrect information. Mike Florio, "Patriots release emails to NFL on leaks of false information", NBC Sports, July 31, 2015. Mike Florio of ProFootballTalk.com later contrasted Wells' lack of concern regarding these leaks with his "outrage" over leaks from Columbia University after they were asked to consult on the investigation. "Ted Wells didn't hire Columbia physicists due to leaks".

On July 31, 2015, John Dennis of WEEI reported that NFL Vice President of Game Operations Mike Kensil was the "main source" of the report regarding 11 of the 12 Patriots footballs being under inflated. Tom E Curran, "Attention circles back to Kensil as Deflategate source", CSNNE, July 31, 2015.

Reactions to the transcript of the appeal hearing
On August 4, as part of the appeals process, the transcript from Brady's appeal hearing were made public. Analysts pointed out that the transcript raised numerous issues regarding both Goodell's ruling and the Wells Report. For example, Goodell's decision upholding the suspension stated:

"The sharp contrast between [sic] the almost complete absence of communications through the AFC championship game undermines any suggestion during the three days following the AFC championship game that the communications addressed only preparation of footballs for the Super Bowl rather than the tampering allegations and their anticipated responses to inquiries about the tampering." Wetzel, Dan. "Roger Goodell's manipulation of Tom Brady's testimony leaves NFL on slippery slope".

Dan Wetzel of Yahoo! Sports notes that this claim directly contradicts Brady's testimony:

"While preparing for the Super Bowl was a primary concern – is that surprising? – Brady couldn't have been more clear that other topics were broached, including the scandal, and that they didn't ONLY discuss football prep for the Seattle game." Id.

This, along with other issues raised, led Wetzel to ask "how does anyone in the NFL – owner, coach, player or fan – possibly trust the league office to investigate and rule on anything ever again?"[90] Sally Jenkins of the Washington Post asked on Twitter whether this "beg[s] that other disciplinary hearings be unsealed, given how NFL misconstrued testimony?" "Sally Jenkins". Twitter. The transcript also showcased that league officials, in particular Troy Vincent, were ignorant of the ideal gas law and natural changes in PSI. "Transcript proves NFL didn't know air pressure could drop naturally - ProFootballTalk". nbcsports.com.

Appearance of conflict of interest of lawyers surfacing during appeal hearing

The independence of Wells and Paul, Weiss & Co. has been doubted, notably by Mike Florio, citing a conflict of interest: Lorin Reisner, who worked on the Wells Report served as the attorney who (on behalf of the NFL) cross-examined Brady at the appeal hearing; in addition, Wells asserted attorney–client privilege during the hearing. "Ted Wells, "independent" investigator in name only - ProFootballTalk". nbcsports.com.

Court proceedings and subsequent vacatur of the suspension

On August 12, the NFL Players Association and Tom Brady met the NFL in the United States District Court for the Southern District of New York at the Daniel Patrick Moynihan United States Courthouse in Foley Square to discuss a possible settlement. No settlement was reached; the next scheduled court date was August 19. The judge asked to know what exact evidence links Brady to deflating footballs, with NFL lawyer Daniel Nash responding that there was "no direct evidence Mr. Brady clearly knew about this," including records of text messages, and phone calls between the quarterback and one of the two Patriots employees implicated. He also indicated there is no "smoking gun" showing that Brady had direct knowledge that the balls were deflated. "Deflategate hearing begins with judge Richard M. Berman yet to decide on Tom Brady settlement case". ESPN.com.

It was reported that, at the August 19th hearing, the Judge, Richard M. Berman, pushed the NFL to settle. While he could not force either side to settle the case, Judge Berman was critical of the NFL's argument with questions of fundamental fairness and evident impartiality. It was also reported that Berman didn't want to make a decision in the case and would rather have had both sides come to a settlement. His tactics in court were to point out the NFL's biggest flaws in their arguments, in hopes that this would trigger the settlement. The next settlement hearing was August 31, with no change in position from either side. ABC News. "No Settlement: Goodell, Brady Await 'Deflategate' Ruling". ABC News. Judge Berman indicated a final decision would be rendered within a week.

On September 3, Judge Berman threw out Brady's suspension on the grounds of a lack of fair due process for Brady. Orr, Conor (September 3, 2015). "Judge nullifies Tom Brady's four-game suspension". National Football League. "Judge rules in favor of Tom Brady in Deflategate; NFL appeals decision". ESPN. September 3, 2015. The NFL announced it would appeal the decision. Patra, Kevin (September 3, 2015). "NFL officially appeals Tom Brady decision". National Football League.

On October 26, 2015, the NFL filed a 61 page brief in court to appeal Judge Berman's decision. Goodell on the following Tuesday stated that the appeal has nothing to do with Patriots QB Tom Brady but instead has to do with the commissioner's current power negotiated into the 2011 Collective Bargaining Agreement. John Breech, "Goodell: NFL's Deflategate appeal has 'nothing to do' with Tom Brady", CBS Sports, October 28, 2015.

<u>Media coverage</u>

<u>Initial reaction</u>

Roxanne Jones of CNN argued that the Patriots should have been thrown out of the Super Bowl even before the NFL had started its investigation. Roxanne Jones (January 23, 2015). "Throw the Patriots out of the Super Bowl". CNN.com.

Initial media reaction to the incident was extremely strong. After the reports broke but before the completion of the NFL's investigation, several media outlets had already called for Belichick — or even the entire Patriots team — to be banned from Super Bowl XLIX. Id. Paul Newberry. "Deflategate should keep Belichick out of Super Bowl". Retrieved February 4, 2015. Maury Brown (January 21, 2015). "Should Bill Belichick Be Suspended For The Super Bowl Over Deflate-Gate?". Forbes.com.  Dan Wetzel of Yahoo! Sports strongly criticized the league for deferring much of the investigation until after the Super Bowl so as not to interfere with the Patriots' preparations. Dan Wetzel (January 22, 2015). "Most troubling news out of Tom Brady's deflate-gate comments: NFL hasn't talked to QB". Yahoo! Sports.   Former quarterback Troy Aikman was quoted as asserting that Deflategate was worse than Bountygate, and that Belichick should receive a harsher penalty than the one-year suspension New Orleans Saints coach Sean Payton received in the latter.  "Aikman: Patriots' punishment should exceed Saints' in bounty scandal". Cbssports.com.  Other voices in the press, meanwhile, took a strident but opposing view, calling it a "phony scandal",  Mike Downey (January 23, 2015). "Deflate-gate: Will the air go out of a phony scandal?". CNN.com,  or "the dumbest sports scandal ever",  Matthew Kory (January 26, 2015). "Deflate-gate Is The Dumbest Sports Controversy Ever". Forbes, and accused the media generally of overhyping the issue.  Is media coverage overinflating 'deflategate'?. CNN.com. January 25, 2015.

Factors that may have helped fuel media interest in the incident include:

   The 2007 Spygate incident, in which the Patriots were sanctioned for having a video camera in an unapproved location filming an opponent's defensive signals during a game in violation of a memo that was sent to the NFL teams, Paul Doyle (January 20, 2015). "Patriots And Belichick: Spygate, Deflategate ... And More". Hartford Courant a memo that misquoted the rules in question. Scott Sheaffer. "The Truth About Spygate: Punishing Success and Promoting Parity". Bleacher Report.
   Unrelated incidents earlier in the season, involving NFL players: Ray Rice knocking his girlfriend unconscious and Adrian Peterson whipping his child, and the media's focus on the reaction by the league. Rupert Cornwell (January 23, 2015). "Deflategate: Soft balls causing a feeling of deflation before Super Bowl". The Independent.

   The two week hiatus between championship games and the Super Bowl, which creates natural pressure on sports journalists writing on the NFL to "fill the void". Frank Schwab

(January 22, 2015). "The five most unbelievable opinions about the deflate-gate controversy". Yahoo! Sports

Chris Mortensen's report, citing league sources, which claimed the balls were as low as 10.5 PSI, which was shown to be false months later when measurements were released in the Wells Report. "ESPN's Chris Mortensen Deletes Tweet Containing Incorrect Deflategate Report - New England Patriots - NESN.com". NESN.com. The Patriots released e-mails showing their lawyers pleading with NFL attorneys to correct the record, but the NFL made no effort to do so. "Patriots release private emails with NFL". Boston.com. This led to criticism from Forbes that ESPN, perhaps due to its "unnerving" financial commitments with the league, were unable to report on the league objectively. Maury Brown. "ESPN's Uncomfortable, Unnerving Relationship With The NFL". Forbes.

The strength of the initial media reaction to the incident contrasts with the very superficial coverage that media outlets gave to allegations of prohibited texts sent by Cleveland Browns staff, "Browns GM Ray Farmer apologizes for 'Textgate' controversy". Sports Illustrated. February 19, 2015 or that the Atlanta Falcons may have secured an unfair advantage by piping in artificial crowd noise during opponent's offensive snaps, even though some argued that if the accusations were true, "that's a far more serious offense than any deflated footballs could possibly be". Jay Busbee (February 3, 2015). "Falcons' Arthur Blank on crowd noise: 'What we've done ... is wrong'". Yahoo! Sports. In November 2014, the Minnesota Vikings and Carolina Panthers were caught on film using sideline heaters to warm the footballs during the game in violation of league policies, Kevin Patra (1 December 2014). "NFL to remind teams not to warm footballs". NFL.com. but no penalties were issued in that case and the media reaction was superficial. Mike Florio (7 May 2015). "Ball tampering involving Panthers, Vikings produced a far different reaction". NBC Sports.

The controversy was not only the dominant topic in the build-up to the Super Bowl, but was discussed beyond sports media. National Review, Tuttle, Ian (January 23, 2015). "Why DeflateGate Is a Cultural Problem". National Review Online and Rush Limbaugh provided social commentary. Rush Limbaugh (January 21, 2015). "The NFL's Big Ball Problem". rushlimbaugh.com. Limbaugh and fellow talk host Mark Levin compared the amount of attention devoted to the controversy with the amount devoted to the death of King Abdullah of Saudi Arabia and the change of government in Yemen, to comment on the priorities of the American public.

### Post-Super Bowl coverage

After the Super Bowl during the offseason DeflateGate continued to be a major news item as the NFL issued its report and penalties were imposed and then appealed. As the story became increasingly less about football and more about science and legal process, it became common for the media to refer to "DeflateGate fatigue". Mark Maske (18 August 2015). "As DeflateGate fatigue descends, Tom Brady's court case rolls on sans settlement". The Washington Post. "DeflateGate weariness has set in, both inside and outside the NFL." Eventually the media began to mock itself in relation to the reporting

of DeflateGate fatigue. "Deflategate fatigue: Media have a field day with NFL scandal". MSN Sports. Brady's successful appeal shortly before the start of the regular season reduced coverage whilst media attention returned to the games themselves, although coverage flared up again for the Primetime game between the Colts and the Patriots in Week 6 of the 2015 NFL season. Darren Hartwell (18 October 2015). "ESPN Attempts To Troll Patriots With Lame Tweet, Gets Destroyed". NESN.

Other media
On January 24, 2015, Saturday Night Live satirized the scandal in a cold open sketch with Beck Bennett as Bill Belichick and Taran Killam as Tom Brady. Schwartz, Nick (January 25, 2015). "'Saturday Night Live' spoofs Deflategate". For The Win (USA Today Sports). On September 16, 2015, South Park satirized the Deflategate scandal in its season 19 premiere episode, "Stunning and Brave". Caffrey, Dan (September 17, 2015). ""Stunning And Brave" – South Park – TV Review". The A.V. Club. In the fall semester of 2015 the University of New Hampshire offered a 400-level course on "DeflateGate". Katie Richcreek (8 May 2015). "University of New Hampshire Offering 'Deflategate' Course". Bleacher Report. "INCO 460 (01) - Deflategate". University of New Hampshire.

# DEFLATEGATE AFTERMATH

It has been 10 months since the 139-page Wells Report and the accompanying 82-page Exponent Report were issued. Within a week, the Patriots created a website and posted an initial, detailed critique of the analysis and conclusions of those reports. Since then, independent critiques of the Wells and Exponent Reports have multiplied and scientists across the country who examined the PSI and weather data have concluded that science fully explains the PSI measurements found in the Wells Report. The Patriots have posted a collection of those positions on their website. Many thoughtful people have, with further information and consideration, revised their initial impressions, which were largely based on false information leaked by League personnel and on the interpretations put on ambiguous, at best, facts by the League and its lawyers.

The League, however, in pursuing its legal strategies, has escalated its defense of the Wells Report and its conclusions, often at the expense of accuracy. In addition, to preserve the public impressions of the Wells Report and the League's pursuit of Tom Brady, the League rejected the suggestion of measuring PSI during every game in the 2015 season and publishing the results. Instead, it chose to perform "random spot checks" during the season and then refused to release the results of those checks, no doubt because doing so would confirm that there was nothing unusual about footballs falling below regulation in cold weather.

Many of the flaws in the Wells and Exponent Reports have been exposed. The detailed scientific critiques of the Exponent Report have been explored by experts. But many of the dubious bases for the Wells Report remain unexplored. For these reasons, we post below our counsel Daniel L. Goldberg's further review of the circumstances that led to the League's investigation and the League's bases for continuing its pursuit of Tom

Brady and the discipline imposed on the Patriots. We hope that it will induce added examination by those who are interested and allow them to reach their own conclusions regarding this matter and how the PSI of the footballs at the AFC Championship Game in January 2015 came to be under 12.5 PSI.

This leaves New England with no draft picks in the top 59 of an above-average draft. No one has really focused recently on the enormity of the draft-pick sanction. Why NFL Should Give Back Picks to Pats (But Won't), Peter King KKQB, 2/22/16. Last year, with the 32nd and 131st picks (the 2017 fourth-rounder likely will be around No. 130 overall), the Patriots took two players (Malcom Brown and Shaq Mason) who started in the AFC title game—two of 22 starters in their biggest game of the year.

Based on the weight of the evidence from the past 13 months, and that weight being circumstantial and not convincing, there's one conclusion I've reached entering the 2016 draft season: Roger Goodell needs to give back the picks. Whatever happens in the appeal of the case—which isn't centered on the Patriots' guilt or innocence but rather on a point of labor law in the judge's decision—Goodell needs to realize he acted without nearly enough scientific evidence against the Patriots. The NFL has some significant circumstantial evidence in the case, the kind that should have prompted a strongly worded letter and $250,000 fine. Instead, Goodell killed an ant with a sledgehammer.

The only thing that could have changed the publics' opinion on the evidence in this case is if the NFL measured the footballs before, at halftime and after all 267 regular-season and post-season games—not just selected games, which is what the league did. The NFL needed to find out what weather and precipitation and humidity and hot air and frigid air did to footballs, to see if the league's questionable science in the Wells Report stood the test of an NFL season. The NFL doesn't have that data because it never administered such tests. The Patriots case cried out for the league to do it this season. The fact that the NFL did so only in scattered games (according to Goodell) simply to ensure no team was cheating this year is stupid; it tells the world the league never wanted to find out the effect of weather on footballs.

Was it reasonable for footballs to lose 1.2 pounds per square inch in inclement weather, which is what New England's footballs did that January day in Foxboro? Or would footballs in a similar environment lose far less pressure? Goodell and the NFL don't want to know the answers. But add those all up. There's no smoking gun. No witness, video, recording or any direct evidence linking anyone with the Patriots to deflating footballs. And then add this: Referee Walt Anderson skates, and never should have. The Wells Report notes that Anderson, in the officials' locker room before the game, got distracted and angry that the bag of game footballs had been taken from the room. In the 19 years Anderson had worked games, Wells reported, Anderson never lost control of the footballs before a game. This was a particularly egregious gaffe by Anderson, seeing that a league official had warned the officials before the game to be on the lookout for funny business with the footballs. This, in legal terms, is losing the integrity of the evidence. What would happen in the real world if a police officer didn't follow proper protocol and lost crucial

evidence to a case for eight or 10 minutes, during which time the evidence could be doctored? The case would be thrown out of court. The footballs were out of sight, and the league put the full blame for it on McNally and none of the blame on Anderson. The referee in the AFC Championship Game lost track of the footballs, and the NFL chose not to make it a factor—apparently because of Anderson's pristine reputation—in its ruling. It should have been a factor, and a big one.

# SOURCES OF THE NFL COMMISIONER'S AUTHORITY TO IMPOSE DISCIPLINE FOR PLAYER MISCONDUCT

The NFL's traditional sources of authority to discipline players for their offensive conduct are generally found in three documents: 1) The NFL Constitution and By-Laws, ("League Constitution"), 2) NFL Collective Bargaining Agreement, ("CBA"), and 3) Player Contracts.

Gregg Doyel, *Goodell's Conduct Policy Veering from Mostly Right to All Wrong*, CBSSPORTS.COM (Apr. 18, 2010), http://www.cbssports.com/columns/story/13243927/goodells-conduct-policy-veering-frommostly-right-to-all-wrong.

## A. League Constitution

The League Constitution created the NFL's foundation and is the "contract which defines the respective powers of the league and its component clubs." Jan Stiglitz, Player Discipline in Team Sports, 5 MARQ. SPORTS L. REV. 167, 170 (1995), Michael A. Mahone, Jr., Note, Sentencing Guidelines for the Court of Public Opinion: An Analysis of the National Football League's Revised Personal Conduct Policy. Under the League Constitution, the NFL Commissioner has the authority to impose disciplinary measures against a player who has "violated the [League] Constitution . . . or has been or is guilty of conduct detrimental to the welfare of the [NFL] or professional football." Id. (quoting CONSTITUTION AND BY-LAWS OF THE NATIONAL FOOTBALL LEAGUE, art. VIII, § 8.13(A), as reprinted in Robert C. Berry & Glenn M. Wong, 1 LAW AND BUSINESS OF THE SPORTS INDUSTRIES 511 (1986)). This grant of authority is quite expansive. The Commissioner's broad power to impose discipline, however, seems implicitly limited by Article VIII, Section 8.13(B). This provision "requires the NFL Commissioner to secure the approval of the NFL Committee in order to impose discipline beyond his express authority." Parlow, supra note 11 (citing Mahone, supra note 13). However, to the extent known in practice, this apparent limitation has not been cited by an offending player and does not otherwise appear to infringe upon the League's authority to punish players. Id. at 188.

## B. NFL Collective Bargaining Agreement

The National Football League collective bargaining agreement is a labor agreement which reflects the results of collective bargaining negotiations between the National Football League Players Association (NFLPA) and National Football League (NFL) team owners. The labor agreement classifies distribution of league revenues, sets health and

safety standards and establishes benefits, including pensions and medical benefits, for all players in the NFL.

"While the League Constitution establishes the framework for the operation of the NFL, the CBA codifies the reciprocal transfer of power between the players and the league." Mahone, supra note 13. It is also the "supreme governing authority" concerning NFL employment.18 Article XI, Section 1(a) of the NFL CBA expressly states that the authority to discipline players is a right vested in the Commissioner by the players. *Id.* at 191 (citing COLLECTIVE BARGAINING AGREEMENT BETWEEN THE NFL MANAGEMENT COUNCIL AND THE NFL PLAYERS ASSOCIATION, March 6, 2006, art. XI, § 1(a). This provision further provides that the Commissioner may punish a player's offensive conduct "that is 'detrimental to the integrity of, or public confidence in, the game of professional football.'" *Id.* at 192 (quoting NFL CBA, *supra* note 19). The NFL is also empowered to discipline misconduct that occurs on the playing field. *Id.* (citing NFL CBA, *supra* note 19).

Should an offending player want to appeal the punishment he received by the League, the NFL CBA states that the offending player may only raise the appeal to the NFL Commissioner or his designee and that the original disciplinary decision "may only be affirmed, reduced, or vacated . . . ." *Id.* (quoting NFL CBA, *supra* note 19).

The first collective bargaining agreement was reached in 1968 after player members of the NFLPA voted to go on strike to increase salaries, pensions and benefits for all players in the league. Later negotiations of the collective bargaining agreement called for injury grievances, a guaranteed percentage of revenues for players, an expansion of free agency and other issues impacting the business of the NFL. The NFLPA and team owners have negotiated seven different agreements since 1968.

Most recently, in 2011, players and team owners reached a collective bargaining agreement after a player lockout and court-ordered mediation. The currently active agreement was ratified in 2011 and extends through the 2020 season, and includes changes to league revenue distribution, increases in player benefits and health and safety improvements including major limits on offseason, preseason and regular season practice activities

## C. Player Contract

The Player Contract controls the relationship between individual players and the member teams of the NFL. Henderson, *supra* note 5, at 175. Also, the Player Contract is incorporated within the NFL CBA and is the means through which the players consent to the League's authority to impose discipline for offensive conduct. Mahone, *supra* note 13 (citing NFL CBA, *supra* note 19, app. C, § 15). More specifically, the Player Contract contains an "integrity of the game" provision that permits the NFL Commissioner to discipline a player who "is guilty of any form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football . . . ." Henderson, *supra* note 5, at 176 (citing PERSONAL CONDUCT POLICY, supra note 7).

*D. Personal Conduct Policy*

Throughout the 1990s, NFL players allegedly committed criminal acts with increasing regularity, including acts of sexual violence toward women. Bethany P. Withers, *The Integrity of the Game: Professional Athletes and Domestic Violence*, 1 HARV. J. SPORTS & ENT. L. 145, 171 (2010) (citing Note, *Out of Bounds: Professional Sports Leagues and Domestic Violence*, 109 HARV. L. REV. 1048, 1050 (1996)).

In response to this increase in violent activity, former NFL Commissioner Paul Tagliabue instituted the NFL Violent Crimes Policy, *Id.* at 168. The NFL Violent Crimes Policy was renamed the Personal Conduct Policy in 2000. *Id.* the first policy of its kind among the major U.S. sports. Ambrose, *supra* note 2, at 1086–87 The Violent Crimes Policy declared: It will be considered conduct detrimental for Covered Persons [i.e., players] to engage in (or to aid, abet or conspire to engage in or to incite) violent and/or criminal activity. This policy will be applicable to all criminal conduct involving violence which occurs after the Covered Employee commences negotiations for employment with the NFL, any NFL club or related entity (including, in the case of players, those drafted by an NFL club as well as those under contract of employment) and will include all such conduct occurring after that date. Henderson, *supra* note 5, at 171.

In other words, the Violent Crimes Policy allowed Commissioner Tagliabue to take disciplinary action against a player charged with any violent crime, misdemeanor, or felony. Withers, *supra* note 25, at 168. However, **punishments issued under this Policy could only be imposed after the legal system concluded its process, thereby precluding immediate action by the NFL.** *Id.* **at 168–69. Waiting for a disposition in a legal proceeding did not seem to satisfy the League's interest in protecting its image;** *See* **Ambrose,** *supra* **note 2, at 1088 (citing Judy Battista,** *Pro Football; Lifetime Spent Preparing for Top Job in the N.F.L.***, N.Y. TIMES, July 30, 2006, at A1) (stating that protecting the NFL's image became "one of [Roger] Goodell's top priorities" after he assumed the role of Commissioner in 2006). Therefore, NFL team owners, executives, coaches, and players called for a stronger Policy.32 After consulting with players and securing the support of the then head of the Players Association, the NFL unveiled its revised Policy.**

# II. APPLICATION OF THE PERSONAL CONDUCT POLICY TO INSTANCES OF MISCONDUCT:

## A. AN UNFAIR, AMBIGUOUS AND ARBITRARY "GUESSING-GAME"

Although the League Constitution, NFL CBA, and Player Contract all serve as sources of authority for the NFL to discipline players, the NFL appears to rely the most on the

Policy when punishing players for their offensive conduct. *See* Ambrose, *supra* note 2, at 1076–77 (citing Mike Reiss, *Jones Takes Hit from NFL: Titan Suspended for 2007 Season*, BOSTON GLOBE, Apr. 11, 2007, at 5D) (providing that Roger Goodell, on April 10, 2007, decided to strengthen the League's Policy and put "everyone" on notice regarding how he would enforce it).

As noted above, the Policy allows the NFL to investigate any alleged incident of misconduct in order to learn all relevant facts and, when appropriate, meet with the offending player to discuss the conduct at issue. PERSONAL CONDUCT POLICY, *supra* note 7, at 2. Once the League's investigation is complete, the NFL may then discipline the offending player to whatever extent is warranted. *Id.*

The problem with imposing discipline "as warranted," is that it begs the question "what exactly is 'warranted' in a given case?" Discipline is warranted when a player does something foolish to embarrass the NFL, which harms the League's reputation to some degree. This premise, fans note, makes the NFL's disciplinary decisions under the Policy the product of a guessing game rather than a standardized procedure that is capable of repetition, which, as a result, means that the discipline is partial and unfair.

The "as warranted" clause in the Personal Conduct Policy and the argument that League-based disciplinary decisions are the product of a guessing game, admittedly, seem to be rather extreme. Although it is true that the as warranted clause seems to provide the League with the awesome power to impose a wide variety of discipline, the clause does not necessarily mean that the NFL imposes discipline capriciously. However, it does seem that the spirit of this criticism may, in fact, be valid. Disciplinary responses issued under the Policy, while perhaps not the product of a guessing game, do appear susceptible to influences, which could create the appearance that the League's disciplinary decisions seem disparate, inconsistent, or unpredictable to the NFL's fan base.

Moreover, in at least two different sets of cases, it seems that the fan base's suspicion that the Policy imposes inconsistent, unpredictable punishments may, in fact, be justified.

## B. PLAINTIFF FANS HAVE STANDING AND PRIVITY TO CHALLENGE HARMFUL AND PATENTLY UNFAIR SANCTION BY DEFENDANTS

# III. STANDING

The Defendants could argue that the person or organization best able to sue the Defendant NFL and its Commissioner would be Patriots owner Robert Kraft and his team.  It could be argued that they have more "privity" than Patriots fans to sue. The \

Plaintiffs argue that Robert Kraft is not a natural plaintiff in this matter, despite his position as owner of a team that has been penalized. Kraft as a owner-member of the NFL is compromised and his hands essentially "tied" in that "you cannot sue yourself." True, the late Oakland Raiders owner Al Davis sued the NFL over his right to move his team. But Davis was ostracized by his fellow owners as an "outlaw" and was persona non-grata with the League establishment after that lawsuit. The boys club of the NFL is very important to Robert Kraft. He is on several powerful committees and is looked at as one of the few leaders of the League. Furthermore, Kraft was instrumental in hiring Commissioner Roger Goodell and has stood by Goodell's side throughout embarrassing errors and controversies such as the Ray Rice case, where many in the public and media called for Goodell to step down. Moreover, Kraft has believed all along that even though he has has disagreements with Goodell, that Goodell is good for the League, (because he has helped the NFL grow its product and earn massive revenues). Although many in Patriots Nation would have wished that Kraft would have appealed the penalties levied by Goodell, and were angry when he did not, they understand that his cozy relationship with the NFL by virtue of being an owner, made it difficult to seek redress. He also thought that Goodell would "do the right thing" once it was clear Deflategate was a manufactured nothing.

Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue. Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a "personal stake in the outcome of the controversy," Baker v. Carr, 369 U.S. 186, 204, as to ensure that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution."

The requirement that a party have standing flows from the Article III requirement of a "case or controversy." U.S. Const. art. III, § 2, cl. 1. Standing analysis focuses on whether "a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." Sierra Club v. Morton, 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). PIRG seeks to represent the interests of its members. Such "representational standing" is appropriate where 1) the organization's members would have standing to sue on their own, 2) the interests the organization seeks to protect are germane to its purpose, and 3) neither the claim asserted nor the relief requested requires individual participation by its members. See Hunt v. Washington Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); Automobile Workers v. Brock, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). PDT contends that PIRG's individual members would not have standing to pursue this suit on their own, so PIRG lacks standing to sue.

For individual standing, the Supreme Court states that:

at an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the

putatively illegal conduct of the defendant," . . . and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision . . . ."

Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted).

Plaintiffs have filed affidavits with the Motion regarding how the Defendants' actions have adversely affected them. These affidavits state an injury sufficient to satisfy the requirements of Article III. As the Supreme Court noted in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), harm to aesthetic and recreational interests is sufficient to confer standing. Sierra Club, 405 U.S. at 735, 92 S.Ct. at 1366; Middlesex County, 453 U.S. 1, 16-17, 101 S.Ct. 2615, 2624-25, 69 L.Ed.2d 435 (1981). These injuries need not be large, an "identifiable trifle" will suffice. United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973). The interests asserted by the plaintiffs in this case are more than trifles. The pollution in the Kill Van Kull has interfered with these plaintiffs' enjoyment of this natural resource. Since PDT has not introduced any evidence to suggest that the affiants have not legitimately stated injuries in fact to their aesthetic and recreational interests in the Kill Van Kull. PIRG has satisfied the first prong of the Valley Forge test. Accord Friends of the Earth v. Consolidated Rail Corp., 768 F.2d 57, 61 (2d Cir. 1985) (affidavit by FOE member was sufficient to confer standing on organization where member stated that he drove on bridge over body of water and was offended by its appearance).

# ARGUMENT

A temporary restraining order enjoining the enforcement of Defendants' official policies, practices and customs should be issued if the Court finds that (a) Plaintiff suffers a threat of irreparable harm; (b) the balance between the harm to Plaintiff and the harm created by granting the injunction weighs in favor of issuing an injunction; (c) Plaintiffs are likely to succeed on the merits of the litigation; and (d) the public interest supports the issuance of the injunction. Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). See also Davis v. Francis Howell Sch. Dist., 104 F.3d 204 (8th Cir. 1997). Plaintiffs satisfy each element of the Dataphase test as to each of the constitutional claims. Therefore, Plaintiff is entitled to a temporary restraining order, which plaintiff requests is put in place prior to the April 28, 2016 NFL Draft.

# I. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF IMMEDIATE INJUNCTIVE RELIEF IS NOT GRANTED.

The Plaintiffs and their team will suffer irreparable harm if they are not allowed to pick in the first round of the NFL Draft on April 28, 2016.  An injunction and temporary restraining order should issue by this Court since the Plaintiffs meet the criteria of the

injunctive relief test. The Plaintiffs have a likelihood of success on the merits of their claims, as their star quarterback has already beat the Defendants in U.S. Federal Court. Justice Berman has only been overruled 8% of the time, so his ruling will likely stand. The Plaintiffs will suffer irreparable harm if an injunction does not issue, as the 2016 first round pick will be gone forever. The balance of equities is an easy prong in favor of the Plaintiffs. The Defendants will not be harmed in any way if the pick is restored by this Court. Finally, the fourth prong of the injunctive relief test is met, as the public interest will be best served when justice prevails and the powerful are not allowed to unfairly and inequitably lord over its inferiors. The public will gain more trust in the justice system if it holds for truth and fairness.

Irreparable harm is the sine qua non of injunctive relief -- a showing of a likelihood of irreparable harm in the absence of an injunction is a critical factor in the injunction analysis, without which a court will not issue an injunction, American Bar Association 35th Annual Forum on Franchising, PROVING IRREPARABLE HARM -- HAVE THE STANDARDS CHANGED? Griffith Towle, Bartko, Zankel Tarrant & Miller and Robert Zarco, Zarco Einhorn Salkowski & Brito, P.A., October 3 - 5, 2012 Los Angeles, CA.

An injunction is an equitable remedy "by which a court tells someone what to do or not to do. "It is "never awarded as of right." Rather, whether an injunction is warranted is subject to the discretion of the court guided by traditional principles of equity. Inland Steel Co. v. United States, 306 U.S. 153, 156 (1939); Deckert v. Independence Shares Corp., 311 U.S. 282, 290 (1940). The touchstone for injunctive relief "has always been irreparable injury and the absence of legal remedies." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982).

A.   Brief Overview of Relevant Factors

In Winter v. Natural Resources Defense Council, Inc. the Supreme Court recently re-confirmed the traditional four-factor test that a federal court must employ for purposes of determining whether injunctive relief is warranted. Winter, 555 U.S. at 20.

In order to obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that the plaintiff must actually succeed on the merits rather than show a likelihood of success. Amoco Prod. Co. v. Gambell, 480 U.S. 531, 539 (1987).

1.   Likelihood of Success on the Merits

In order to obtain a preliminary injunction, a plaintiff must first prove that he is "likely to succeed on the merits." Winter, 555 U.S. at 20. (emphasis added). Courts have recast the "likely to succeed" factor in a variety of ways, including requiring a plaintiff to demonstrate that there is a "reasonable certainty" or "strong probability" that he will prevail on the merits or that there is a "reasonable probability of success."

11A CHARLES ALAN WRIGHT, ARTHUR R.MILLER &MARY KAY KANE, FED.PRAC.& PROC.CIV. § 2948.3, at 184-88 n. 2 (2d ed.) [hereinafter WRIGHT & MILLER]. While courts differ on their exact formulations of what is required to "succeed on the merits," they agree that a plaintiff must at least present a prima facie case to satisfy this factor. Id.

## 2. Irreparable Harm

The second factor that a plaintiff must establish is that he is likely to suffer irreparable harm in the absence of an injunction. "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." 11A WRIGHT &MILLER, § 2948.1, at 153-54.

In Winter, the Court reiterated the general standard and held that a "mere possibility" of irreparable harm is insufficient to warrant a preliminary injunction. Winter, 555 U.S. at 22 (emphasis added). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Id. (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam)). Thus, the Supreme Court rejected the so-called "alternative test" utilized in the Second, Seventh, Eight and Ninth Circuits, which permitted the issuance of a preliminary injunction upon a lesser showing of harm (i.e., a "mere possibility" of irreparable harm).

In the aftermath of Winter, there has been much confusion whether the "sliding scale" approach—which allows courts to adjust the required showing of the likelihood of success and irreparable harm factors, with a stronger showing of one compensating for a weaker showing of another factor—adopted by many circuits remains appropriate. Adding to the uncertainty is Justice Ginsberg"s statement in her dissent that "[t]his Court has never rejected [the sliding scale approach], and I do not believe it does so today. "Winter, 555 U.S. at 51 (2008). The Second, Seventh and Ninth Circuits have continued to apply the sliding scale test after Winter, See Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-32 (9th Cir. 2011); Judge v. Quinn, 612 F.3d 537, 546 (7th Cir. 2010); Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 34 (2d Cir. 2010). while the Fourth Circuit has expressly rejected this approach. Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), cert. granted, judgment vacated, 130 S. Ct. 2371 (2010), and adhered to in part sub nom., 607 F.3d 355 (4th Cir. 2010).

## 3. Balance of Equities

A court must also balance the equities of the case. This involves balancing the harm to the defendant if an injunction is granted with the harm to plaintiff if an injunction is denied. Amoco Prod. Co., 480 U.S. at 542 ("[A] court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."). The balance of the equities must tip in favor of the plaintiff for a court to award injunctive relief.

4.   Public Interest

Finally, a court must consider the effect, if any, on the public if the injunction is granted or denied. Winter, 555 U.S. at 376-77 (citing Weinberger, 456 U.S. at 312 (1982)) "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."''). In so doing, courts weigh any policy considerations involved in issuing or denying an injunction. A court may deny an injunction because the public interest would be unduly burdened if the injunction was issued. Winter, 555 U.S. at 376-77 (citing Weinberger, 456 U.S. at 312 (1982)). A court may deny an injunction because the public interest would be unduly burdened if the injunction was issued. Courts can also consider the impact that issuing or denying an injunction may pose on any third parties.

What is at Stake for the Plaintiffs if the Defendants were Allowed to Arbitrarily and Capriously Take its First Round Draft Choice

There is much value in a first round pick for the Patriots. Patriots owner Robert Kraft called the penalties levied against the Patriots and Tom Brady "the harshest penalty in the history of the NFL."

Holding on to draft picks is the key to long-term success in the NFL, and one of the reasons the Patriots have become such a dynasty. (The other reasons: Bill Belichick and Brady.) Advanced stats suggest that drafting well is a total crapshoot, which means that teams who historically "draft well" only do so because they've had the most picks. Head Coach Bill Belichick seems to know this: One of the reasons the Patriots have had so much success over the years is simply that they've accrued picks every time they've been able to. These picks have by and large worked out, too.

Here are the team's first picks from 2010 to 2013:

   2010 — Devin McCourty, S (five-year starter)
   2011 — Nate Solder, LT (four-year starter)
   2012 — Dont'a Hightower, LB (three-year starter)
   2012 — Chandler Jones, DE (three-year starter)
   2014 --- Dominique Easely, DT (two-year starter)
   2015 --- Malcolm Brown, DT (one-year starter)

These are all key pieces to the winning machine that is the Patriots, and even if there is no real key to drafting well, Belichick has still landed successful additions time and again. "In this age of parity, the salary cap, it's very hard to compete without the lifeblood of the draft, so we understand the importance [of losing a first-round pick]," Kraft said. "And I assure you, we've done everything we can do that has a chance of success."

It is "just" No. 29 -- a pick at the end of the first round -- but it's a pick being taken from a team that has drafted Chandler Jones, Dont'a Hightower, Nate Solder, Devin McCourty,

Rob Gronkowski, Sebastian Vollmer, Jerod Mayo and Logan Mankins in the first or second rounds over the past decade. The Patriots clearly have a higher "hit" percentage than most.

Teams with New England's 2014 Simple Rating System (SRS) score tend to pick 22nd in the first round of the draft two years later and 21st in the fourth round (or 117th overall) the year after that. Deflategate: Losing Draft Picks Hurts The Patriots More Than Tom Brady's Suspension, FiveThirtyEight, Neil Paine, May 12, 2015. Those numbers probably understate the quality of the picks, since without four games of Brady, the Pats may fare worse than the average 10.9-SRS team. But they serve as a good gauge of what the Patriots were stripped of in Monday's decision. Turning to Chase Stuart's invaluable research on the value of draft picks, those two picks are worth 19.2 points of marginal Approximate Value (AV) over the first five years of the draftees' careers.

## II. THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER CAUSES ABSOLUTELY NO HARM TO THE DEFENDANTS

In order for a temporary restraining order to issue, the Court must find that the potential harm to Defendants from issuance of the temporary restraining order "does not outweigh the possible harm to the Plaintiffs if such relief is denied." Dataphase, 640 F.2d at 113. Although it is certainly rare for a defendant or defendants to *not be harmed at all* by an order restraining them from doing something that they have made clear they want to do, in the matter at bar *that is actually the case.* Defendants will not be harmed *at all* by this Court granting the Plaintiffs' simple and rational request to reinstate by their first round pick in the April 2016 draft. Furthermore, there is an NFL draft every year and should the First Circuit Appeals Court- New York Division, First Circuit or remand or the U.S. Supreme Court overturn Brady v. NFL, or new information comes out that the Patriots or any of their employees cheated or broke any rules that warrant a sanction such as loss of draft pick(s), then the NFL could easily punish the Patriots *next* year (or any year in the future).

Since there is absolutely no harm to the Defendants by issuing the requested relief, Plaintiffs move that this Honorable Court grant such relief. Judge Berman in Brady v. NFL, ignored the collective bargaining agreement between the NFL and NFLPA. If the facts that the Defendants argue implicated Brady and the Patriots, triggering Defendant Goodell's punishments were thrown out as not credible by the United States Federal Court Southern District of New York, Goodell has no grounds to take the Patriots first-round pick away.

As a result, Brady was suspended by the Commissioner for the first four games of the 2015-2016 NFL regular season. The United States District Court for the Southern District of New York ruled in Brady's favor and vacated the arbitration award handed down by the Commissioner. The issue with the court's decision is that it largely ignores

and undermines the bargained for agreement between the NFL and the National Football
League Players Association (NFLPA).

# III. PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

## A. The Defendants' Taking Away the Patriots' 1st Round Draft Choice in an Arbitrary and Caprious Fashion also Lacked Due Process

Despite an inflated and conflated national frenzy determining their guilt from the
deflategate inception and the Respondent spending over $13 million so far to investigate
and besmirch them, Tom Brady and the New England Patriots soundly won their case in
federal court.

The peoples' right to pursue political change through the initiative petition process is a
fundamental aspect of Maine law. Speech activities on public property or even at a
privately owned shopping center or superstore are protected by the Maine constitution,
rights which may not be infringed by the public entity, store or center.  According to
Article I Section 4 of the Maine constitution, "Every citizen may freely speak, write and
publish sentiments on any subject…"  Furthermore, "All power is inherent in the
people…" (Article I, Section 2).  Maine citizens have an unalienable right to petition.
"The people have a right at all times in an orderly and peaceable manner to assemble to
consult upon the common good, to give instructions to their representatives, and to
request, of either department of the government by petition or remonstrance, redress of
their wrongs and grievances," (Article I, Section 15).  Municipalities, shopping centers
and malls that open up their property freely to the public may not then violate the
constitutional rights of any members of the public.

While the nature of Defendants' violation of the constitutional rights of Maine citizens
that collect signatures for Plaintiff's petition is not uniform, the existence of violation is
homogenous.  In all instances defendants have refused to let petitioners petition at their
premises, (usually on sidewalks outside the entrance to their facility or other common
areas).  Defendant malls all are at least regional malls, meaning they are of significant
size and draw citizens from the entire region surrounding the mall- usually at least a 60
mile radius.  These malls have replaced the traditional town forums which our founding
fathers held so dear to the ideals that this country was founded on- freedom of speech and
expression.

Courts must "respect and . . . give effect to the power the people have reserved to
themselves to amend the Maine Constitution through initiative measures." Through the
initiative petition process, Maine citizens act as a separate legislative body authorized to
take action when or if the Unicameral fails to act or, in the peoples' view, acts
inappropriately. See, David B. Magleby, <u>Direct Legislation Voting on Ballot Propositions</u>

in the United States 35 (1984) (The initiative is "the means by which voters can correct
legislative sins of omission and the popular referendum as the means of correcting
legislative sins of commission.") Thus, the peoples' right[1] to enact law through petition
is separate from, but equal to the Unicameral's right to pass legislation. See generally,
P.K. Jameson and Marsha Hosack, Citizen Initiatives in Florida: An Analysis of Florida's
Constitutional Initiative Process, Issues, and Alternatives, 23 Fla. St. U.L.Rev. 417, 418
(1995) ("Initiatives generally allow the public to bypass the legislature and reserve direct
lawmaking power in the voters of the state.") Maine citizens have a legally recognized
right and the constitutional authority to amend the laws of the State through the initiative
process, and the government is preclude from hindering the citizens' ability to exercise
this power.[2]

## B. Defendant Commissioner Goodell's Has a History of Courts Essentially Ruling He Lacks Integrity in His Arbitrary Actions and Unlawfully Violates the NFL's Bylaws. This Leaves Goodell As a "Strawman" Commissioner With No Power to Legislate Decisions, Such as Taking The Patriots' 2016 Draft Pick Away

I'm no attorney but it's long seemed to me that NFL fans can and should compel the
owners to follow their own bylaws which state clearly on page 28, Article VIII,
Employment, 8.1 **"The League Shall select and employ a person of Unquestioned**

---

[1] Though the peoples' right to enact legislative or constitutional amendments through initiative petition is
clear, the process is not easy. Groups seeking to place measures on the ballot through initiative petitions
must generally hire paid petition circulators because "the numbers (of signatures needed) are so great, the
time is so short and people don't do anything for free anymore." A reporter who tried circulating petitions
in California wrote: "I must have made 10 attempts without a strike [signature]. And with each failure, the
more tentative I grew." How Big Money Swamps the Ballot, San Francisco Chronicle, May 19, 1998.
Circulating petitions is "work . . . time-consuming and it is tiresome – so much so that it seems that few but
the young have the strength, the ardor, and the stamina to engage in it, unless, of course, there is some
remuneration." Meyer v. Grant, 486 U.S. 414, 423-24 (1988). Nor is the initiative petition process
inexpensive. See Duggan, 249 Neb. at 418, 544 N.W.2d at 73 (noting that $205,000 was raised to fund an
initiative petition seeking term limits on Nebraska elected officials).

[2] This limit on a state government's ability to hinder the initiative petition process was created, at least in
part, in an effort to thwart the potential for governmental abuse. At the beginning of the agitation for this
reform, there was a popular belief among the people that by the strictly representative plan of expressing
the popular will, the people were too frequently misrepresented and often betrayed. Indeed, so intense was
this feeling that there arose a common cry that representative government was a failure. There was, without
dispute, much to justify this feeling. Senatorial elections by the Legislature in many instances had become a
national disgrace. Refusal to enact laws repeatedly demanded by the people through their party platforms
and otherwise, instilled the belief that corruption was rife and that legislators were subject to the influence
of privileged interests.
> The refusal of Legislatures to submit constitutional amendments, popularly
> demanded, which in most cases required a two-thirds vote in each house of the
> assembly, added to the feeling of wrong and injustice.
Van Kleek v. Ramer, 62 Colo. 4, 24, 156 P. 1108, 1115 (1916) (Justice Scott, dissenting).

**Integrity to serve as Commissioner of the League..."**
http://www.nfl.com/static/content/public/static/html/careers/pdf/co_.pdf

If any owner would like to assert that Goodell, whom two US District Court Judges have effectively called a "liar," has "unquestioned integrity" I'd love to hear them justify it. Conversely, if they assert that the NFL bylaws are simply optional guidelines, I'm sure the NFLPA and certain players accused of rule violations would love to know that as well And if NFL rules ARE something that are optional, then there's no reason why the Patriots draft picks can't be returned.But at the very least I'd just like to hold the owners feet to the fire and have them on record as to whether Goodell has unquestioned integrity. As paying ticket holders, we have a right to a fair and even playing field, and when the Commissioner himself has been proven to be unfair, the game itself is unfair

# IV. PLAINTIFFS HAVE SEVERAL AVENUES OF STANDING

Defendant Robert Kraft has used the excuse to the media and Patriots fans that he cannot sue the NFL because he as an owner has a restrictive covenant with the other owners not to sue the NFL/each other. If Kraft states he cannot sue then next in line are the actual fans who seem to support the team much more passionately and fervently than Mr. Kraft. These fans such as the Plaintiffs are also the ones responsible for making Mr. Kraft and his other 31 owner friends billionaires or making them multi-billionaires and allowing them to pay Defendant Commissioner Goodell a yearly salary in excess of $30 million. The Plaintiffs and fellow fans are the "true" guardians and modern Patriots and they should have just as much standing as anyone under the sun.

First ... an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent," not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); see also Summers v. Earth Island Institute, 555 U.S. 488, 493 (2009).

While the standing test is easily stated, it can be difficult to apply. The Supreme Court has observed that "[g]eneralizations about standing to sue are largely worthless as such." Association of Data Processing Service Organizations Incorporated v. Camp, 397 U.S. 150, 151 (1970).

The Supreme Court also imposes "prudential" limitations on standing to ensure sufficient "concrete adverseness." United States v. Windsor, 133 S. Ct. 2675, 2687 (2013) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)). See, e.g., Elk Grove Unified School District v. Newdow, 542 U.S. 1 (2004) (relying on principles of prudential standing to deny

standing to student's father who sought to challenge requirement that his daughter recite Pledge of Allegiance, when father's right to act on his daughter's behalf was founded on disputed issues of state family law).These include limitations on the right of a litigant to raise another person's legal rights, a rule barring adjudication of generalized grievances more appropriately addressed legislatively, and the requirement that a plaintiff's complaint must fall within the zone of interests protected by the statute at issue.[3]

The Supreme Court has made it clear that the burden of establishing standing rests on the plaintiff. DaimlerChrysler Corporation v. Cuno, 547 U.S. 332, 342, n.3 (2006); FW/PBS Incorporated v. Dallas, 493 U.S. 215, 231 (1990). At each stage of the litigation—from the initial pleading stage, through summary judgment, and trial—the plaintiff must carry that burden. Defenders of Wildlife, 504 U.S. at 561.Standing must exist on the date the complaint is filed and throughout the litigation. Davis v. Federal Election Commission, 554 U.S. 724, 734 (2008).

## A. Actual and Imminent Injury

Once a cognizable injury has been asserted, the Supreme Court has long cautioned that the injury in fact be "actual and imminent, not conjectural or hypothetical." Summers v. Earth Island Institute, 555 U.S. 488, 493 (2009). The injury to the Plaintiffs is actual and imminent. If relief is not given by this Court, on April 28, 2016 the Patriots will have their draft choice unfairly taken.

Of relevance here, the Court cited Clapper and held that "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." Susan B. Anthony List v. Dreihaus, 134 S. Ct. 2341 (2014). The injury to the Plaintiffs, (having their draft pick taken) is certainly impending, and there is more than a substantial risk to the Plaintiffs of harm, as Defendant Roger Goodell said in no uncertain terms in the last week or so that he has not changed his mind and the Patriots will have no 2016 first-round pick.

A showing of either standard may therefore be sufficient. In the pre-enforcement context, that standard may be satisfied when the plaintiff expresses an intent to engage in arguably unlawful speech and there is a "credible threat" of enforcement. Id. at 2342-2343.

In Susan B. Anthony List, the Court held that standing standard was satisfied by the combination of burdensome administrative proceedings before the commission combined with the subsequent threat of criminal prosecution because prior speech, likely to be repeated, had previously been found unlawful in a proceeding before the commission

---

[3] The Supreme Court examined the distinction between Article III and prudential limitations on standing in the unusual context presented in Windsor, the recent case that invalidated the Defense of Marriage Act. There, the Supreme Court held that the United States had standing to appeal a trial court's decision to require it to pay a tax refund although it refused to defend the statute on which it had denied and continued to deny the request for refund. The Court further held that the importance of the issues, the prospect of time-consuming and costly litigation over DOMA were the appeal dismissed, and the presentation by a Congressional group that intervened to support the constitutionality of DOMA counseled against dismissing the appeal on prudential grounds. Windsor, 133 S. Ct. at 2684–89.

mooted by the withdrawal of the claim. At least in the context of a pre-enforcement challenge, the Court in <u>Susan B. Anthony</u> appeared to temper Clapper's "certainly impending" language and leave opportunities to continue to argue the viability of the alternative "substantial risk" formulation.

# B.   LIMIT TO STANDING
**Distinct and Palpable Injury**

There is a rather palpable distinction between valid standing and matters that do not have standing as they are too tenuous.  One of the most common examples of failed standing is unsuccessful suits against government by "taxpayers."  Courts have consistently held such taxpayers' connection by virtue of them being taxpayers is too remote a connection with the government they are challenging for valid standing.

One of the goals of public law litigation is to force the government to comply with the Constitution and federal statutes. In the absence of more specific injuries, plaintiffs have claimed that the Constitution confers upon all citizens the right to a lawful government and upon all federal taxpayers the right not to be taxed to support unlawful governmental activity. In a largely unbroken line of cases, the Supreme Court has refused to permit litigation of these so-called citizen or taxpayer suits.[4]

In <u>United States v. Richardson</u> and <u>Schlesinger v. Reservists Committee to Stop the War</u>/74/, the Court held that injury resulting from the allegedly unlawful expenditure of tax monies did not confer standing because of the "'comparatively minute, remote, fluctuating and uncertain' impact on the taxpayer." <u>United States v. Richardson</u>, 418 U.S. 166 (1974),  <u>Schlesinger v. Reservists Committee to Stop the War</u>, 418 U.S. 208, at 174 (1974).  With respect to the interest of citizens in lawful government, the Court repeatedly characterized the injury to plaintiffs as citizens as "remote," "abstract," "generalized," and "undifferentiated," rather than "concrete." Because of this, the Court has held that this "motivation [to enforce the Constitution] is not a substitute for the actual injury" required for standing. <u>Schlesinger</u>, 418 U.S. at 226.  <u>Clapper</u> reiterated the

---

[4] The most recent Supreme Court case on this point is DaimlerChrysler Corporation v. Cuno, 547 U.S. 332, 341-46 (2006), in which the Court rejected state and municipal taxpayer standing for the same reasons that it had done so in prior federal taxpayer standing cases. The only area in which the Supreme Court has approved of taxpayer standing is in certain suits challenging spending on grounds that it violates the Establishment Clause. Flast v. Cohen, 392 U.S. 83 (1968), which established this exception has between frequently distinguished and narrowed.  See Arizona Christian School Tuition Organization v. Winn, 131 S. Ct. 1436 (2011) (Arizona taxpayers have no standing to challenge law permitting tax credits for contributions to organizations which provide scholarships to students attending private and parochial schools, distinguishing tax credits from government expenditures); Hein v. Freedom from Religion Foundation, 551 U.S. 587 (2007) (finding taxpayers have no standing to challenge conferences sponsored by the President's Faith-Based and Community Initiatives Centers because those offices were funded from general Executive Branch appropriations, distinguishing Flast v. Cohen, 392 U.S. 83 (1968), in which plaintiffs challenged the distribution of funds to religious schools pursuant to Congressional spending power legislation); Bowen v. Kendrick, 487 U.S. 589 (1988); Grand Rapids School District v. Ball, 473 U.S. 373 (1985), overruled in part on other grounds by Agostini v. Felton, 521 U.S. 203 (1997); Flast v. Cohen, 392 U.S. 83 (1968).  In DaimlerChrysler, the Court expressly refused to expand this exception to Commerce Clause challenges to state tax or spending decisions.  DaimlerChrysler, 547 U.S. at 347-48.

Court's long-standing rejection of the notion that standing doctrine should be applied to permit some plaintiff standing for fear that the law or practice could go otherwise unchallenged. Clapper, 133 S. Ct. 1138.

In the instant matter, Plaintiffs' situation differs markedly from failed tax payer suits. Plaintiffs are not suing the government as tax payers; a group that is overly-inclusive by the very fact that we are all essentially tax payers. The Plaintiffs on the other hand are a smaller, more defined group, fans of one of 32 NFL teams. The Plaintiffs also have a distinct claim that is unique from the rest of the NFL fans in the country. They are the only ones that had their first-round pick taken this year. Moreover, they are the only ones who have been punished for no valid reason. Their resulting injury is concrete and not abstract or hypothetical.

The Court expounded on these principles in Warth v. Seldin, where the Court coined the phrase "distinct and palpable injury" to capture the requirement that plaintiffs must plead more than a generalized or undifferentiated grievance against the government. Warth v. Seldin, 422 U.S. 490 (1975). "Distinct" generally means that the challenged act or policy affects the plaintiff differently from citizens at large. "Palpable" means that the resulting injury is concrete and not abstract or hypothetical. The Court explained in Warth that the prohibition against citizen standing and taxpayer standing did not derive from Article III. Rather, the requirements that a plaintiff suffer a distinct and palpable injury are "essentially matters of judicial self-governance." Id. at 500.

## C. Injury Fairly Traceable to the Challenged Conduct

The Plaintiffs' injury is easily traceable to Defendants' unlawful conduct. In addition to alleging injury in fact, the plaintiff must demonstrate that the injury is fairly traceable to the defendant's unlawful conduct. In cases in which the government acts against the plaintiff, causation is simple. When, however, governmental action or inaction relates to third parties or only indirectly affects the plaintiff, the question becomes whether the causal connection between action and injury is sufficient to confer standing. The Supreme Court has found standing in some cases notwithstanding an attenuated or uncertain chain of causation. Duke Power Company v. Carolina Study Group, 438 U.S. 59 (1978); United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669 (1973); see also Bryant v. Yellen, 447 U.S. 352 (1980). At the same time, the Court has denied standing in cases in which the chain seemed both shorter and more certain. Professor Pierce opines that these cases reflect the Supreme Court's use of causation to preclude review of cases that pose difficult justiciability issues on other grounds. Pierce, supra note 73 , § 16.5 at 1165-66. The Court's standing causation jurisprudence has been markedly inconsistent and offers few lessons for general application.

The Court held that causation is present even if there is a tentative or incremental link between the challenged action (or inaction) and asserted injury. Massachusetts v. Environmental Protection Agency, 549 U.S. 497, at 523 (2007). The earlier cases measured causation in terms of the degree to which the link between conduct and injury was clear or certain. In a sense, causation was clear and certain in Massachusetts; the issue was, instead, the extent to which the link must be quantitatively significant. On that point, the Court was rather forgiving, although it suggested that a more relaxed standard was in order when a state is the plaintiff.

## D. Relief Sought to Redress Injury

A corollary to the Supreme Court's requirement for standing that the injury alleged be fairly traceable to the challenged conduct is the separate requirement that the relief sought must redress the injury. In the great majority of cases the inquiry into causation and redressability are indistinguishable. Thus, in Warth the Court held that there was no reason to suppose that the elimination of exclusionary zoning would enable the plaintiffs to obtain housing in Penfield. In Eastern Kentucky Welfare Rights Organization, the Court held that there was no reason to think that revoking the IRS Revenue Ruling at issue would assure that the next ill or injured poor person would be admitted to a hospital. Furthermore, in Allen, the Court held it was entirely speculative that revoking tax-exempt status for allegedly discriminatory private schools would serve to foster public school integration. What is peculiar about the Court's concern for redressability is the elevation of the question of remedial efficacy to constitutional status.

While the scope of equitable relief to redress unlawful governmental action has long been a matter of controversy, not until City of Los Angeles v. Lyons did the Court clearly articulate the requirement of remedial efficacy as a constitutional component of standing. City of Los Angeles v. Lyons, 461 U.S. 95 (1983). The plaintiff in Lyons sought damages and injunctive relief after being choked by city police officers. He alleged that the city permitted the police department to use unnecessary choke holds indiscriminately. The Court conceded that Lyons had standing to sue for damages. However, the Court held that he lacked standing to seek injunctive relief. An injunction would not redress his injury because it was unlikely that he would be arrested and choked again. This differs from the case at bar, as an injunction will perfectly and completely redress Plaintiffs' injuries. Plaintiffs are not seeking damages, just simple injunctive relief. There will be no injury to Defendants, as they can always take future picks away in the future for any alleged conduct in 2015 or in the future.

Lyons differs dramatically from Warth and Eastern Kentucky Welfare Rights Organization. In the earlier cases, the Court's concern for remedial efficacy was a corollary to the requirement that the plaintiff establish that the injury was fairly traceable to defendant's unlawful conduct. If the causal link between the defendant's conduct and the plaintiff's injury was tenuous, then it followed that injunctive relief against that conduct was unlikely to remedy the injury. Thus, the requirement of remedial efficacy

grew out of the focus upon causation; whenever causation was in doubt, so too was remedial efficacy.

The notion of uncertainty in redressability arose in a different context in Defenders of Wildlife. In that case, plaintiffs challenged a regulation that did not require funding agencies to consult with the government before granting funds to projects that might harm endangered species. The Court found that plaintiffs had not demonstrated redressability because the funding agencies were not otherwise bound by any consultation requirement and because the funding agencies supplied only a small percentage of the financing for certain projects. Lujan v. Defenders of Wildlife, 504 U.S. 555, 568-71 (1992). Even if those funds were withdrawn, the plaintiffs did not show that the project would be suspended or cause less harm to the endangered species, a showing that would be formidable, if not impossible.

The ability of prospective injunctive relief to remedy past wrongs dealt with in Lyons has echoes in Steel Company v. Citizens for a Better Environment./105/ In Steel Company, plaintiff sued a manufacturing firm for past violations of a federal statute requiring users of certain toxic and hazardous chemicals to file forms with the Environmental Protection Agency that detail the name, quantity, and disposal methods of various chemicals. The Environmental Protection Agency alerted the firm that it had failed to file the forms for several years. The firm then did so. Suing the firm for violating the statute, the plaintiff asserted that the company's failure to file these forms precluded the plaintiff from learning about its operations. The plaintiff sought declaratory and injunctive relief and civil penalties.

The Court found that the plaintiff failed the redressability prong of the standing test. With respect to injunctive relief, the plaintiff sought an order permitting it to inspect the firm's facilities and records and requiring the firm to submit future forms to the Environmental Protection Agency. The Court held that such relief would not redress the injury previously caused when the firm failed to file the forms. The plaintiff did not allege that such a violation was going to happen again, and, without it, there was no basis for prospective injunctive relief.

In contrast, the Court's approach to redressability in Massachusetts v. Environmental Protection Agency was somewhat more forgiving. Massachusetts v. Environmental Protection Agency, 549 U.S. 497 (2007). Again, caution is warranted because the apparently unique standing analysis applicable when states are plaintiffs. There, the Court emphasized that the relief requested need not remedy the entire injury suffered by the plaintiff; regulation of greenhouse gas emissions from new cars will not solve the global warming problem. Id. at 546. The Court, though, seized on Environmental Protection Agency statements underscoring the need to address the problem, including voluntary measures. These statements suggested Environmental Protection Agency's recognition that some regulation must offer some prospect for at least slowing global warming. Holding that the redressability prong can be satisfied even if relief only promises modest reductions in remote risk, the Court held that:

In sum —at least according to petitioners' uncontested affidavits—the rise in sea levels associated with global warming has already harmed and will continue to harm Massachusetts. The risk of catastrophic harm, though remote, is nevertheless real. That risk would be reduced to some extent if petitioners received the relief they seek. Id. That is analogous to the instant case, in that Plaintiffs' uncontested affidavits attest that they will be harmed by Defendants' actions taking away their team's pick. The anticipated argument by Defendants that harm to Plaintiffs is remote, does not trump the fact that the harm is real, which is quite obvious from their affidavits showing how important the Patriots are to their lives and how important a potential 10 year starter for their team could hurt the team they love so much. This pain and anguish that would befall the Plaintiffs would be eliminated if they receive the relief they seek.

Reconciling these standing cases is not realistically possible. However, the Court seems far more likely to find standing in cases brought pursuant to a specific federal statute which reflected Congress' intent and desire for judicial intervention. Pierce, supra note 73, §16.7; see also Federal Election Commission v. Akins, 524 U.S. 11 (1998); Havens Realty Corporation v. Coleman, 455 U.S. 363 (1982); and Trafficante v. Metropolitan Life Insurance Company, 409 U.S. 205 (1975) discussed infra. Such statutes evidence a legislative judgment that certain classes of plaintiffs suffer injury in fact when the statute is violated, that the violation causes the injury, and that such injury is redressable by the statutory remedies provided. These statutes also explicitly reflect Congress' desire that courts intervene to resolve disputes arising from the statutes. As the Court recently put it, "Congress [can] define new legal rights, which in turn will confer standing to vindicate an injury caused to the claimant." Vermont Agency of Natural Resources v. United States, 529 U.S. 765, 773 (2000). With the exception of Defenders of Wildlife, the Court found standing in each case arising from such statutes. When, however, the action does not arise from such statutes and there is no explicit legislative mandate for intervention, the Court takes a much narrower view of standing. This is particularly true in cases, often involving constitutional questions, that pose challenges to the judicial function when standards of decision are not readily available or discernible, Pierce, supra note 82, §16.7. This may explain cases like Warth v. Seldin, 422 U.S. 490 (1975), Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26 (1976); Linda R.S. v. Richard D., 410 U.S. 614 (1973), and certain taxpayer standing cases.


## E. Associational Standing

Groups may have standing in a representative capacity, in an individual capacity, or in both. A group has standing in a representative capacity when it represents the rights of its members. Such standing is an exception to the general prohibition on third-party standing. An association has standing in an individual capacity (or qua group) when it asserts its own rights as an organization.
3.1.C.1. Representative Capacity

The leading case articulating the standing requirements for groups that sue in a representative capacity is Hunt v. Washington Apple Advertising Commission, 432 U.S. 333 (1977). The Court stated in Hunt:

Thus we have recognized that an association has standing to bring suit on behalf of its members when:

(a) its members would otherwise have standing to sue in their own right;
(b) the interests it seeks to protect are germane to the organization's purpose; and
(c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Id. at 343; see also Friends of the Earth v. Laidlaw Environmental Services, 528 U.S. 167, 181 (2000) (association successfully demonstrates standing of members through declarations).

The first prong of the Hunt test establishes a traditional standing inquiry grounded in Article III's case or controversy requirement. The second prong is also constitutionally based and is designed to ensure that the association has both a concrete stake in the outcome of the litigation and will approach it with adversarial vigor. In contrast, the Supreme Court has ruled that the third prong is a prudential limitation in the same sense as third-party standing discussed below. United Food and Commercial Workers v. Brown Group, 517 U.S. 544, 556-57 (1996) (holding that the prong "may guard against the hazard of litigating a case to the damages stage only to find plaintiff lacking detailed records or the evidence necessary to show the harm with sufficient specificity. And it may hedge against any risk that the damages recovered by the association will fail to find their way into the pockets of the members on whose behalf injury is claimed").

With respect to the first element, when an organization asserts standing in a representative capacity, Hunt does not require the organization to allege that it has suffered any injury. Rather, the organization must establish that those whom it represents have suffered an injury sufficient to confer standing. See, e.g., Northeastern Florida Chapter of the Associated General Contractors v. City of Jacksonville, 508 U.S. 656, 666 (1993) (injury-in-fact requirement in equal protection case does not require plaintiff to prove that she would have obtained benefit in absence of challenged barrier). The organization need not establish that a substantial number of its members have suffered injury. Injury to a single member will do. United Food and Commercial Workers, 517 U.S. at 555; ACLU of Ohio Foundation v. Ashbrook, 375 F.3d 484, 489-90 (6th Cir. 2004) (identifying single member who appeared in a courthouse to challenge display there on Establishment Clause grounds); Consumer Federation of America v. Federal Communications Commission, 348 F.3d 1009, 1011-12 (D.C. Cir. 2003). Examples of a case in which a plaintiff could have identified an injured member, but failed to so are Disability Rights Wisconsin v. Walworth County Board of Supervisors, 522 F.3d 796, 802-03 (7th Cir. 2008) and National Alliance for the Mentally Ill v. Board of County Commissioners, 376 F.3d 1292, 1296 (11th Cir. 2004). However, that member must be specifically identified.  In Earth Island Institute, the Supreme Court rejected the sufficiency for standing purposes of an assertion that some members of a large membership organization probably will experience harm. Earth Island Institute, 555 U.S.

at 497-98. Instead, submit affidavits from specific members directly affected by the challenged conduct.

## F. THIRD PARTY CLAIMS

The Plaintiffs satisfy the Supreme Court's test for standing in "third party" matters, as they suffered an injury in fact, they have a close relationship with the New England Patriots as diehard fans, and there is a hindrance to third party New England Patriot's ability to protect their own interests, since owner Robert Kraft is a member of the 32 owner NFL and states he "cannot sue himself."

Third Party Standing

Third-party standing issues arise when a party seeks relief by asserting the rights of third parties not before the court. Generally, parties may seek only to vindicate their own legal rights rather than those of others. The Supreme Court recently distinguished third-party standing cases from cases in which an assignee of a legal claim files suit. In such actions, the assignee asserts their own legal rights, not those of another, even when the assignee has promised to repay the assignor money recovered in the litigation. Sprint Communications v. APCC Services, 128 S. Ct. 2531 (2008). The presumption against third-party or jus tertii standing rests on prudential principles rather than an application of Article III limitations on standing.   See United Food and Commercial Workers Union v. Brown Group, 517 U.S. 544, 557 (1996). Those prudential limitations, in turn, are grounded upon concerns that third parties may not wish to have their rights asserted, that parties are less likely to advocate vigorously the rights of others, and that the quality of judicial decision making may suffer when concrete evidence of harm is not presented by those suffering it. See Singleton v. Wulff, 428 U.S. 106, 114-15 (1976); Erwin Chemerinsky, Federal Jurisdiction 84-91 (5th ed. 2007). The Supreme Court has generally permitted third-party standing in cases when enforcement of the challenged law or conduct affects third parties indirectly, but has been somewhat less willing to sanction use of third-party standing in other contexts. Kowalski v. Tesmer, 543 U.S. 125, 129 (2004) (attorneys lack standing to challenge state process for appointing appellate counsel for indigent defendants who plead guilty). The instant Plaintiffs have standing since Defendants' enforcement of Commissioner Goodell's conduct in taking away their pick affects them indirectly in a sufficient manner for standing.

The Court developed a three-part test, each prong of which must be satisfied in order to bring third-party claims: "[t]he litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relationship to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." Powers v. Ohio, 499 U.S. 400, 411 (1991) (citations omitted); see Kowalski, 125 S. Ct. at 567. As this test has been applied, however, the Court has found standing even in cases in which the second or third prong has not been clearly established.

The first prong of the test has been rigorously enforced. The plaintiff must satisfy traditional constitutional standing requirements; the challenged law or conduct must injure the party in order for that party to assert the rights or interests of third parties. With respect to the second prong, the Supreme Court has not articulated specific standards for the degree of the closeness of the relationship between the plaintiff and the third party whose rights are asserted, or the nature of the relationship which satisfies this criterion.

With respect to the third prong of the test, the Supreme Court frequently permits third-party standing when the third party is unlikely to assert its own interests. Most recently, the Court permitted third-party standing in jury selection cases. In Powers v. Ohio, a white criminal defendant appealed his conviction on the ground that the prosecutor's use of peremptory challenges violated the equal protection rights of prospective African American jurors. Powers v. Ohio, 499 U.S. 400 (1991). The Court first found that discriminatory use of peremptory challenges caused the defendant injury in fact, regardless of race, because such use called into question the fairness of the trial. Id. at 411-12. Second, the Court held that the connection between the defendant and excluded jurors was "as close as, if not closer than" those in cases such as Triplett because "[v]oir dire permits a party to establish a relation, if not a bond of trust, with the jurors." Id. at 413. Somewhat more convincingly, the Court further noted that the defendant was likely to advocate vigorously on behalf of the excluded jurors in order to secure a reversal of his conviction. Id. at 413-14. The Court held that excluded jurors were unlikely to challenge their exclusion since the costs were high and potential benefits low, but that, even if they did, they would be unable to obtain declaratory or injunctive relief. Id. at 415. The Powers rationale has been extended to civil cases and challenges to the selection of grand jurors. Edmonson v. Leesville Concrete Company, 500 U.S. 614, 629 (1991); and Campbell v. Louisiana, 523 U.S. 392, 397-98 (1998), respectively.

In Singleton v. Wulff, a leading case in this area, the Supreme Court held that a physician had standing to assert the rights of patients in challenging a state statute limiting Medicaid-covered abortions. The Court noted the close relationship between doctor and patient and stated that the relationship was directly implicated by the law challenged. Similarly, the Court permitted an attorney to challenge a statute limiting the ability to recover attorney fees in black lung benefit cases on the ground that the statute violated his client's due process right to legal representation. U.S. Department of Labor v. Triplett, 494 U.S. 715, 720-21 (1990). In its most recent third-party standing case, the Supreme Court held that criminal defense attorneys did not have third-party standing to assert claims of future clients. Kowalski, 543 U.S. at 130-31. In so doing, the Court observed that third-party standing was appropriate in cases in which the limitation or restriction challenged by the plaintiff prevented the third party from establishing a lawful relationship with the plaintiff. Triplett, 494 U.S. at 720. This principle might have been applied in Kowalski, but was not.

This notion explains a number of cases in which the Court held that suppliers of products may challenge restrictions on sales by asserting the rights of customers to obtain the product. In Craig v. Boren, for example, a seller of beer was permitted to challenge on equal protection grounds an Oklahoma law that prohibited sales of 3.2 percent beer to men under 21, while allowing the sale to women aged 18 to 21.  Craig v. Boren, 429 U.S. 190 (1976). While the relationship between a tavern and customers seems more tenuous than that between a doctor and patient or an attorney and client, the Court justified its holding on the ground that the seller "is entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should her constitutional challenge fail and the statutes remain in force." Id. at 195. Craig's sweep is potentially quite broad. The articulated justification for the decision admits of no logical limit, and how the third prong, discussed infra, was satisfied is difficult to see. The Supreme Court observed that the law banned the sale, not the consumption, of 3.2 percent beer, but this hardly seems a substantial barrier blocking young men from challenging the statute. Similarly, the Court has permitted booksellers to assert the First Amendment rights of book buyers, (Virginia) and sellers of contraceptives to assert the privacy rights of customers. (Carey), Carey v. Population Services International, 431 U.S. 678, 682-83 (1977); Eisenstadt v. Baird, 405 U.S. 438, 443 (1972); but see Tileston v. Ullman, 318 U.S. 44, 45-46 (1943) (denying standing of doctor to challenge laws prohibiting use of contraceptives on behalf of patients). Virginia v. American Booksellers Association, 484 U.S. 383, 392 (1988).

With respect to the third prong of the test, the Supreme Court frequently permits third-party standing when the third party is unlikely to assert its own interests. Most recently, the Court permitted third-party standing in jury selection cases. In Powers v. Ohio, a white criminal defendant appealed his conviction on the ground that the prosecutor's use of peremptory challenges violated the equal protection rights of prospective African American jurors.  Powers v. Ohio, 499 U.S. 400 (1991). The Court first found that discriminatory use of peremptory challenges caused the defendant injury in fact, regardless of race, because such use called into question the fairness of the trial. Id. at 411-12. Second, the Court held that the connection between the defendant and excluded jurors was "as close as, if not closer than" those in cases such as Triplett because "[v]oir dire permits a party to establish a relation, if not a bond of trust, with the jurors." Id. at 413. Somewhat more convincingly, the Court further noted that the defendant was likely to advocate vigorously on behalf of the excluded jurors in order to secure a reversal of his conviction. Id. at 413-14. The Court held that excluded jurors were unlikely to challenge their exclusion since the costs were high and potential benefits low, but that, even if they did, they would be unable to obtain declaratory or injunctive relief. Id. at 415. The Powers rationale has been extended to civil cases (Edmonson) and challenges to the selection of grand jurors. (Campbell) Campbell v. Louisiana, 523 U.S. 392, 397-98 (1998). Edmonson v. Leesville Concrete Company, 500 U.S. 614, 629 (1991).

The question of barriers to third parties enforcing their own rights has also featured prominently in cases involving unlawful racial covenants and the distribution of contraceptives. In Barrows v. Jackson, for example, whites who sued for violating racially restrictive covenants in their deeds were permitted to assert the equal protection rights of African Americans, who could not sue as they were not parties to the covenant.

Barrows v. Jackson, 346 U.S. 249 (1953). In Eisenstadt v. Baird, a doctor who was prosecuted for distributing contraceptives to unmarried persons was permitted to assert the rights of such persons. Eisenstadt v. Baird, 405 U.S. 438 (1972). Such persons were not subject to prosecution and were thereby "denied a forum in which to assert their own rights." Id. at 446.

At the same time, one can imagine scenarios in which young males interested in buying 3.2 percent beer, Medicaid beneficiaries, individuals wishing to obtain contraceptives, and African Americans seeking to purchase property encumbered by a racially restrictive covenant could assert their rights in litigation that they would initiate. This suggests a reasonably relaxed approach to the third prong of the test. However, this may be more reflective of the Court's more generally forgiving approach to standing in the 1970s. The more recent cases in the jury selection area did not raise significant third-prong problems. However, the Court's most recent third-party standing case struck a more cautionary note, focusing more on legal barriers to third-parties bringing claims than their likelihood of success in doing so. In Kowalski v. Tesmer, the Court held that *pro se* criminal defendants who plead guilty were not hindered in challenging a state statute forbidding the appointment of appellate counsel. Kowalski v. Tesmer, 543 U.S. 125, 131-32 (2004). Such a defendant subsequently did so successfully. Halbert v. Michigan, 545 U.S. 605 (2005) (due process and equal protection clauses require appointment of counsel for defendants convicted on guilty pleas in applying for leave to appeal in intermediate court).

At least two justices have suggested that the Supreme Court revisit and clarify the law of third-party standing. In Miller v. Albright, a woman born abroad and out of wedlock to an American father and a foreign mother challenged, along with her father, a provision in the Immigration and Nationality Act that created different citizenship requirements for those born abroad of an alien father and American mother as opposed to those born abroad to an alien mother and American father. Miller v Albright, 523 U.S. 420 (1998). The lawsuit asserted that the father's equal protection rights were violated. Nonetheless, the district court dismissed the father's claim for lack of standing. The father did not appeal.

Citing only Craig, the plurality opinion written by Justice Stevens and joined by Chief Justice Rehnquist held that third-party standing was appropriate. Addressing the issue in more detail, Justice Breyer, on behalf of Justices Souter and Ginsburg, who dissented on other grounds, agreed. Justice O'Connor, joined by Justice Kennedy, would have denied third-party standing on the ground that the father did not face sufficient barriers to asserting his own rights. Justices Scalia and Thomas expressed agreement with Justice O'Connor but cited Craig to suggest that the third prong of the test was not especially demanding. Justice Scalia concluded that "[o]ur law on this subject is in need of what may charitably be called clarification." Id. at 451 n.1; see also Kowalski, 543 U.S. at 134-36 (Thomas, J., concurring).

Creating a complex and unnecessary obstacle to the assertion of a claim by attempting to have one plaintiff assert the rights of others makes no sense. Simply join representative individuals whose rights are at issue as named plaintiffs.

Third-party standing rules are more clearly developed in the context of overbreadth claims. The prototypical overbreadth claim arises when regulation of activity protected by the First Amendment is challenged on the ground that the regulation sweeps substantial protected as well as unprotected conduct or expression within its prohibition. When plaintiff is engaging in expression clearly subject to permissible regulation under a properly drawn restraint, the overbreadth challenge raises third-party standing issues.

The leading case is <u>Secretary of State of Maryland v. Joseph H. Munson Company</u>, 467 U.S. 947 (1984). The Court held that a plaintiff invoking third-party standing in an overbreadth case must establish only that he had suffered injury in fact and that he would adequately frame the issues. Anyone who has suffered injury is unlikely to be unable to frame the issues adequately. Thus, the only real requirement is the irreducible minimum requirement of injury in fact. To demonstrate injury in fact in an overbreadth case, the plaintiff must demonstrate "a genuine threat of enforcement" of the statute against his future activities. <u>City of Houston v. Hill</u>, 482 U.S. 451, 459 (1987) (quoting <u>Steffel v. Thompson</u>, 415 U.S. 452, 475 (1974)). Thus, in <u>Hill</u>, an individual who had been arrested four times but never convicted under an ordinance prohibiting interference with a police officer had standing to seek to enjoin future enforcement on the ground of overbreadth. Underlying the special third-party standing rule for overbreadth cases is the risk that the absent party whose rights are at issue may refrain from the protected activity rather than sue to vindicate First Amendment rights. Should that happen, society loses the views of those who are silenced.

# IV. THE PUBLIC INTEREST SUPPORTS THE ISSUANCE OF AN INJUNCTION.

There can be no legitimate public interest served by suppressing constitutionally protected conduct. The avoidance of constitutional harm is, of itself, a significant societal good. See, <u>Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers</u>, 2001 WL 15333 at 35 (citing <u>Edwards J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council</u>, 485 U.S. 568, 575 (1988).

## CONCLUSION

Plaintiffs are indebted to the team that has brought us much joy- an embarrassing amount of winning and dominance. Thinking in your mind that you would actually stand up to oppressive powers and risk your life and your family members lives is probably a lot different than standing up and going out with a musket and fighting a seemingly insurmountable power. I'd like to think I would defend our homeland. I can say it's a heck of a lot simpler to draft a few motions  in an office that all the war heroes combined (like both of my grandfathers) fought and died for. In some minute way maybe we will achieve another victory for the modern patriots if only in this comparatively small way. Right a

glaring wrong on principle of nothing else and get back what was wrongfully taken from us.

Our 'general' Robert Kraft has been compromised. We need to help him do what he would like to do but cannot because he chooses not to be ostracized by his brotherhood of fellow billionaire owners. We fans will step into his shoes and do what he chooses not to do. It seems that he in some ways has forgot where he comes from. We don't see him as having greater standing than us. After 'we' win the super bowl in 2015 Kraft said to millions on tv when interviewed- we are all patriots. Defendant surely will argue legal theories how only Kraft has standing but when the millions of fans in patriots nation across the world talk about 'our team' and how 'we' have won 4 Super Bowls or we lost to the Broncos in the playoffs last year, we can strongly assert that the strong love and emotion we have for our team counts for something. Do you think the minutemen of the revolution or the hundreds of thousands of soldiers who have died for their country or were maimed and disabled made those sacrifices so billionaire owners with monopolies that congress has granted them can collude to disenfranchise the fans that have made them richer than almost everyone in the world? I would argue not and our case should be heard. Kraft may own the team and reap millions in revenue but he like us watched the team on television and sat on those metal bleachers in late November in Foxborough 1-15 seasons.

As a result of the policies and practices of Defendants in their respective cities, have unlawfully and without justification taken away the Plaintiffs' draft choice and an injunction and restraining order must be issued to mitigate that harm.

**"We are all Patriots now." Yes we are. Plaintiffs and millions more are Patriots fans and share Plaintiffs' sentiments that their team was punished not for meritorious or legitimate reasons, but arbitrarily and capriously due to petty jealously. Justice must be served and the Patriots' draft choice must be reinstated.**

The Plaintiffs cannot stand idly by while a grave injustice is levied by a power-drunk Commissioner and his NFL owner bosses, blinded by the billions of dollars they have earned together from the fans like Plaintiffs.

For all of the foregoing reasons, Plaintiffs request that this Court enter a temporary restraining order and preliminary injunction enjoining Defendants and their agents from engaging in the unlawful usurpation of the Patriots 2016 first round draft pick.

Respectfully submitted this 4th day of April, 2016.

____/s/ Seth Carey, Esq._____
SETH CAREY, ESQ.,
New England Patriots Fans
Plaintiffs
MB# 662718
114 Congress St.

P.O. Box 100
Rumford, ME 04276
(207) 364-7826
stcareylaw@gwi.net

## CERTIFICATE OF SERVICE

I hereby certify that I sent a copy of the foregoing Plaintiffs' Expedited Motion for Temporary Restraining Order and Preliminary Injunction by hand delivery via process server 5th day of April, 2016 to: the National Football League at 345 Park Ave., New York, NY and Roger Goodell, 345 Park Ave., New York, NY, and Robert K. Kraft, by hand delivery by process server to One Patriot Place, Foxborough, MA.

Seth T. Carey, Esq.